# APPENDIX "12"

LEXSEE 1995 U.S. DIST. LEXIS 1981

**SILVER TOP LIMITED and SAVE POWER LIMITED, Plaintiffs, - against - MONTEREY INDUSTRIES LTD., DONALD SMILEY and ANDREW YIU, Defendants.**

**94 Civ. 5731 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***1995 U.S. Dist. LEXIS 1981***

**February 10, 1995, Decided**
**February 21, 1995, FILED**

**COUNSEL:** [*1] For SILVER TOP LIMITED, SAVE POWER LIMITED, plaintiffs: Avrom S. Fischer, New York, NY.

For DONALD SMILEY, defendant: Marshall Fishman, Rosenman & Colin, NY, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiffs Silver Top Limited and Save Power Limited (collectively, the "Plaintiffs") brought this action against Monterey Industries, Ltd. ("Monterey"), Donald Smiley, and Andrew Yiu ("Yiu"). Defendants Monterey and Yiu (collectively, the "Defendants") n1 now move to dismiss the action on the grounds of insufficiency of service of process and lack of personal jurisdiction or, alternatively, to quash service of the summons and complaint. Consequently, Defendants also move to quash Plaintiffs' discovery request pursuant to *Rule 26(c)(1) of the Federal Rules of Civil Procedure.* For the reasons set below, the motion is denied in all respects.

n1 Defendant Smiley has not joined in this motion.

**I. Facts**

Monterey is a corporation formed and registered under the Companies Ordinance of Hong Kong, Chapter 32 of the Laws of Hong Kong. (Ex. "CSWS-2" referred to in Simon Aff. P 2.) Andrew Yiu is a director of Monterey and the owner of 9,999 [*2] of the 10,000 shares issued in Monterey. (Id.) Pursuant to Section 92 of the Companies Ordinances, Monterey filed the address of its registered office with the Companies Registry ("Registry"). (Joseph Lap Bun Tse n2 Aff. P 3; Simon n3 Aff. P 2.) Pursuant to Section 158 of the Companies Ordinance, Monterey also filed the residential address of defendant Yiu, its director, with the Registry. (Joseph Lap Bun Tse Aff. P 4; Simon Aff. P 2.) Sections 92 and 158 require that changes of address be filed with the Registry. (Joseph Lap Bun Tse Aff. PP 3, 4.)

n2 Joseph Lap Bun Tse is a solicitor admitted to practice before the Supreme Court of Hong Kong. On Plaintiffs' request, Joseph Lap Bun Tse submitted an affidavit regarding the provisions of Hong Kong law relevant to this action.

n3 Chu Shih Wen Simon is a non-party to the action, over eighteen years of age, who Plaintiffs contend served the summons and complaint upon Defendants.

Between October 15, 1994 and November 17, 1994 a process server, Chu Shih Wen Simon, [*3] made numerous attempts to serve Monterey and Yiu. (Simon Aff. PP 2-15.) On December 3, 1994, the process server sent, by registered mail, a copy of the summons and complaint to Monterey at the address filed with the Registry. (Id. P 17.) The server also inserted a copy of the summons and the complaint through the letter box at the same address.

(Id. P 16.) On December 8, 1994, the process server sent, by registered mail, the summons and complaint to Yiu at the address filed with the Registry. (Id. P 19.) The server also inserted a copy of the summons and complaint through the letter box of the apartment at Yiu's residential address. (Id. P 18.) Yiu is a joint owner of this apartment. (Id. P 6). According to the Registry's records, the above addresses were the current addresses of Monterey and Yiu. (Id. P 23.)

On December 14, 1994, counsel for Monterey and Yiu returned four envelopes containing the pleadings to Plaintiffs' counsel, Avrom Fischer. (Fischer Aff. at 1.) The envelopes had no return address. (Id.) In the accompanying letter, counsel for Defendants stated that the pleadings were never delivered to Monterey or Yiu. (Id.)

**II. Service of [*4] Process**

*Rule 4(f) of the Federal Rules of Civil Procedure* governs service of process upon individuals residing in a foreign country. Rule 4(f)(1) provides that where there is a treaty with a foreign nation, service of process must be effected by the means provided in the treaty. As an example, Rule 4(f)(1) cites to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"). Rule 4(f)(2) provides for other means of service but these are available only "if there are no internationally agreed means of service." Therefore, the Hague Convention applies whenever service is made in a foreign country that is a party to the Convention, provided that the country has not objected to, or imposed restrictions on, a particular method of service. See *Ackermann v. Levine, 788 F.2d 830, 839 (2d Cir. 1986).* Rule 4(h)(2) states that service upon corporations in a foreign country is to be done in "any manner prescribed for individuals by subdivision (f) except for personal delivery as provided in paragraph 2(C)(i) thereof."

In the instant case, a process server, Chu Shih Wen Simon, sent the summons and complaint by registered [*5] mail to the registered office of Monterey and to the residence of defendant Yiu in Hong Kong. Hong Kong is a party to the Hague Convention. See *20 U.S.T. 361,* reprinted in 28 U.S.C.A. Rule 4 (1992 & Supp. 1994). Therefore, the question before the Court is whether the service of process upon Defendants was proper under the terms of the Convention. As Defendants point out, Plaintiffs did not avail themselves of the service on a designated "Central Authority" in accordance to Article 5 of the Convention. However, the Hague Convention provides for other equally acceptable means of service: the validity of the service of process by registered mail can be determined according to either Article 10(a) or Article 18.

Article 10(a) states in pertinent part: "Provided the State of destination does not object, the present Convention shall not interfere with--(a) the freedom to send judicial documents, by postal channels, directly to persons abroad." Id. (emphasis supplied). In the Second Circuit, the word "send" in the phrase "the freedom to send judicial documents" was interpreted to mean "service." *Ackermann, 788 F.2d at 839.* In Ackermann, [*6] a German plaintiff forwarded a copy of the summons and complaint to the German Consulate in New York, which in turn forwarded the documents by registered mail to the plaintiff's residence. The Court found that the service was proper under Article 10(a) since the United States had not objected to the use of "postal channels" under Article 10(a). Similarly, in the instant case, Plaintiffs sent the summons and complaint to a process server who forwarded these documents by registered mail to Defendants. Since Hong Kong did not object to Article 10(a), see Siegel, Practice Commentaries on *FRCP 4,* reprinted in 28 U.S.C.A. Rule 4 (1994 Cum. Ann. Pocket Part) at 131, service of process by registered mail is an appropriate method of service in that country under the Convention.

Ackermann may be distinguished from *Charas v. Sand Technology Sys. Int'l, Inc., No. 90 Civ. 5638, 1992 U.S. Dist. LEXIS 15227* (S.D.N.Y. Oct. 7, 1992), in which the court found that service of process by mail was not authorized by Article 10(a) in Japan. Japan, however, does not allow service of process by mail by its domestic laws. Id. at *9 In the instant case, the laws [*7] of Hong Kong do allow service by mail. Rules of the Supreme Court of Hong Kong, Order 10, Rule 1. (Joseph Lap Bun Tse Aff. P 5 and Ex. "JT-3".)

In Ackermann, the Court noted that service by registered mail does not violate constitutional due process so long as such notice is "reasonably calculated . . . to provide interested parties notice of the pendency of the action." *Ackermann, 788 F.2d at 841* (citing *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950)).* Service is constitutionally valid if "it is in itself reasonably certain to inform those affected." *Mullane, 339 U.S. at 315.* The Court finds that service by registered mail to Defendants' addresses as they appeared on file with the Registry was reasonably calculated to give notice under all of the circumstances and, therefore, was constitutionally valid.

Defendants argue that they had moved from the addresses filed with the Registry before the service was attempted and, therefore, never received notice of the action. The Court [*8] finds this argument unpersuasive. Since (a) Defendants do not contest that copies of the summons and complaint were delivered to their addresses as filed with the Registry; (b) an address filed with the Registry is a valid address for purposes of service in Hong Kong n4; and (c) Defendants were mandated by Hong Kong law to file promptly any change of

address, n5 the Court finds that service by registered mail to the addresses that were current under Hong Kong law was reasonably calculated to give Defendants notice of the action.

n4 Companies Ordinance, Section 92 (Chapter 32 of the Laws of Hong Kong). (Ex. "JT-1 referred to in Joseph Lap Bun Tse Aff. P 3.); Rules of the Supreme Court of Hong Kong, Order 65. (Ex. "JT-3" referred to in Joseph Lap Bun Tse Aff. P 5.)

n5 Companies Ordinance, Sections 92 & 158 (Chapter 32 of the Laws of Hong Kong). (Ex. "JT-1 referred to in Joseph Lap Bun Tse Aff. PP 3, 4.)

In conclusion, the Court finds that the service of the summons and complaint was proper under the Hague Convention. [*9] Since the application of Article 10(a) is dispositive, the Court need not analyze the validity of service under Hong Kong domestic law (Article 18). Defendants' motion to dismiss the action for insufficiency of process, or alternatively to quash service, is denied. Defendant's motion to quash discovery requests, which was based on the premise that Defendants were never served, is denied as moot.

**III. Conclusion**

For the foregoing reasons, Defendants' motion is denied in all respects.

Dated: February 10, 1995
New York, New York

SO ORDERED.

LAWRENCE M. McKENNA

U.S.D.J.

# APPENDIX "13"

U.S. DEPARTMENT of STATE

***Bureau of East Asian and Pacific Affairs***
**March 2007**



# Background Note: Hong Kong



## PROFILE

**OFFICIAL NAME:**
Hong Kong Special Administrative Region

**Geography**
Area: 1,104 sq. km.; Hong Kong comprises Hong Kong Island, Kowloon, the New Territories, and numerous small islands.
Terrain: Hilly to mountainous, with steep slopes and natural harbor.
Climate: Tropical monsoon. Cool and humid in winter, hot and rainy from spring through summer, warm and sunny in fall.

**People**
Population (2006): 6.9 million.
Population growth rate (2006): 0.9%.
Ethnic groups: Chinese 95%; other 5%.
Religions: About 43% participate in some form of religious practice. Christian, about 9.6%.
Languages: Cantonese (a dialect of Chinese) and English are official.
Education: *Literacy*--92% (95% male, 88% female).
Health (2006): *Infant mortality rate*--1.8/1,000. *Life expectancy*--82.6 yrs. (overall); 79.5 yrs. males, 85.6 yrs. females.
Work force (2006): 3.6 million. *Wholesale, retail, and import/export trades and restaurants and hotels*--28.9%; *finance, insurance, real estate, and business services*--13.3%; *manufacturing*--4.4%.

**Government**
Type: Special Administrative Region (SAR) of China, with its own constitution (the Basic Law).
Branches: *Executive*--Administration: Chief Executive selected in March 2007; Executive Council, serving in an advisory role for the Chief Executive. *Legislative*--Legislative Council elected in September 2004. *Judicial*--Court of Final Appeal is highest court, other lower courts.
Subdivisions: Hong Kong, Kowloon, New Territories.
Suffrage: Permanent residents, at 18 years or over, living in Hong Kong for the past 7 years are eligible to vote.

**Economy** (2006)
GDP (2006): $188.8 billion.
GDP real growth rate (2006): 6.8%.
Per capita GDP (2006): $27,527.
Natural resources: Outstanding deepwater harbor.
Industry: *Types*--textiles, clothing, electronics, plastics, toys, watches, clocks.
Trade: *Exports*--$315.5 billion: clothing, electronics, textiles, watches and clocks, office machinery. *Imports*--$333.3 billion: consumer goods, raw materials and semi-manufactures,

capital goods, foodstuffs, fuels.

**PEOPLE**
Hong Kong's population has increased steadily over the past decade, reaching about 6.9 million by 2006. Hong Kong is one of the most densely populated areas in the world, with an overall density of some 6,250 people per square kilometer. Cantonese, the official Chinese language in Hong Kong, is spoken by most of the population. English, also an official language, is widely understood. It is spoken by more than one-third of the population. Every major religion is practiced freely in Hong Kong. All children are required by law to be in full-time education between the ages of 6 and 15. Preschool education for most children begins at age 3. Primary school begins normally at the age of 6 and lasts for 6 years. At about age 12, children progress to a 3-year course of junior secondary education. Most stay on for a 2-year senior secondary course, while others join full-time vocational training. More than 90% of children complete upper secondary education or equivalent vocational education.

**HISTORY**
According to archaeological studies initiated in the 1920s, human activity on Hong Kong dates back over five millennia. Excavated neolithic artifacts suggest an influence from northern Chinese stone-age cultures. The territory was settled by Han Chinese during the seventh century, A.D., evidenced by the discovery of an ancient tomb at Lei Cheung Uk in Kowloon. The first major migration from northern China to Hong Kong occurred during the Sung Dynasty (960-1279). The British East India Company made the first successful sea venture to China in 1699, and Hong Kong's trade with British merchants developed rapidly soon after. After the Chinese defeat in the First Opium War (1839-42), Hong Kong was ceded to Britain in 1842 under the Treaty of Nanking. Britain was granted a perpetual lease on the Kowloon Peninsula under the 1860 Convention of Beijing, which formally ended hostilities in the Second Opium War (1856-58). The United Kingdom, concerned that Hong Kong could not be defended unless surrounding areas also were under British control, executed a 99-year lease of the New Territories in 1898, significantly expanding the size of the Hong Kong colony.

In the late 19th century and early 20th centuries, Hong Kong developed as a warehousing and distribution center for U.K. trade with southern China. After the end of World War II and the communist takeover of Mainland China in 1949, hundreds of thousands of people fled from China to Hong Kong. Hong Kong became an economic success and a manufacturing, commercial, finance, and tourism center. High life expectancy, literacy, per capita income, and other socioeconomic measures attest to Hong Kong's achievements over the last five decades.

On July 1, 1997, China resumed the exercise of sovereignty over Hong Kong, ending more than 150 years of British colonial rule. Hong Kong is a Special Administrative Region of the People's Republic of China with a degree of autonomy in all matters except foreign and defense affairs. According to the Sino-British Joint Declaration (1984) and the Basic Law, Hong Kong will retain its political, economic, and judicial systems and unique way of life for 50 years after reversion and will continue to participate in international agreements and organizations under the name, "Hong Kong, China."

**GOVERNMENT AND POLITICAL CONDITIONS**
The Hong Kong Special Administrative Region (SAR) is headed by Chief Executive Donald Tsang, who first took office in 2005 and whose current term ends in 2012. The Election Committee that votes on the Chief Executive is made up of approximately 800 Hong Kong residents from four constituency groups: commercial, industrial, and financial interests; professionals; labor, social services, and religious interests; and the legislature, the Chinese People's Political Consultative Conference, and the P.R.C. National People's Congress.

In December 2006, supporters of pro-democracy Civic Party legislator Alan Leong won 134 seats in the Election Committee, enabling Leong to challenge incumbent Chief Executive Tsang's bid for a new five-year term in 2007. Tsang, with solid support from the pro-government and pro-business sectors, won the March 25, 2007 Election Committee vote with 649 of the 795 votes. Leong garnered 123 votes.

In July 2002, the Hong Kong Government implemented the Principal Officials Accountability System, which was designed to make the government more responsive to public concerns.

Eleven political appointees, directly responsible to the Chief Executive, were added to run the 11 policy bureaus. Three other senior civil service positions--the Chief Secretary, Financial Secretary, and Justice Secretary--also were converted to political appointments.

While Hong Kong remains a free and open society where human rights are respected, courts are independent, and there is well-established respect for the rule of law, residents are limited in their ability to change their government, and the legislature is limited in its power to affect government policies. The September 12, 2004 Legislative Council elections were seen as generally free, open, and widely contested, although Hong Kong groups have alleged voter intimidation, manipulation, or pressure in connection with them.

In April 2004, the P.R.C. National People's Congress Standing Committee issued a decision on the scope and pace of constitutional reform, which laid out certain conditions for the process of democratic development. This decision precluded major changes to the electoral systems for the 2007 Chief Executive and 2008 Legislative Council elections, with the result that no significant reform of the electoral systems can be realized until the Chief Executive and Legislative Council elections scheduled for 2012.

In December 2005 the Legislative Council rejected a Hong Kong Government-proposed package of incremental reforms to the mechanisms for choosing the Chief Executive in 2007 and forming the Legislative Council in 2008. In mid-2007, the Hong Kong Government's Commission on Strategic Development is scheduled to issue new proposals to reform the Chief Executive and Legislative Council electoral mechanisms, with the "ultimate aim" of universal suffrage as prescribed by the Basic Law

**Principal Government Officials**
Chief Executive--Donald Tsang
Chief Secretary--Rafael Hui
Financial Secretary--Henry Tang
Secretary for Justice--Wong Yan-long
Secretary for Security--Ambrose Lee
Secretary for Commerce, Industry and Technology--Joseph Wong
Secretary for Housing, Planning and Lands--Michael Suen
Secretary for Education and Manpower--Arthur Li
Secretary for Health, Welfare and Food--Dr. York Chow
Secretary for the Civil Service--Denise Yue
Secretary for Home Affairs--Patrick Ho
Secretary for Economic Development and Labor--Stephen Ip
Secretary for the Environment, Transport and Works--Sarah Liao
Secretary for Financial Services and the Treasury--Frederick Ma
Secretary for Constitutional Affairs--Stephen Lam

**ECONOMY**
Hong Kong is one of the world's most open and dynamic economies. Hong Kong per capita GDP is comparable to other developed countries. Real GDP expanded by 6.8% in 2006 year-on-year, driven by thriving exports, vibrant inbound tourism and strong consumer spending. Severe acute respiratory syndrome (SARS) caused the Hong Kong economy to shrink during the first half of 2003, and property prices had fallen 66% from their late 1997 peak, but have since rebounded by about 59% from that lower base. The unemployment rate declined to 4.3% in December 2006-February 2007, the lowest level since mid-1998. The surplus for fiscal year 2006-07 was $7.1 billion or 3.7% of GDP, attributed to the robust economy, increased corporate profits and salaries, the buoyant stock market, and a stable property market.

Hong Kong enjoys a number of economic strengths, including accumulated public and private wealth from decades of unprecedented growth, a sound banking system, virtually no public debt, a strong legal system, and an able and rigorously enforced anti-corruption regime. The need for economic restructuring poses difficult challenges and choices for the government. Hong Kong is endeavoring to improve its attractiveness as a commercial and trading center, especially after China's entry into the World Trade Organization (WTO), and continues to refine its financial architecture. The government is deepening its economic interaction with the Pearl River Delta in an effort to maintain Hong Kong's position as a gateway to China. These efforts include the conclusion of a free trade agreement with China, the Closer

Economic Partnership Arrangement (CEPA), which applies zero tariffs to all Hong Kong-origin goods and preferential treatment in 27 service sectors. Hong Kong, along with the Macau SAR, is also participating in a new pan-Pearl River Delta trade block with nine Chinese provinces, which aims to lower trade barriers among members, standardize regulations, and improve infrastructure. U.S. companies have a generally favorable view of Hong Kong's business environment, including its legal system and the free flow of information, low taxation, and infrastructure. The American Chamber of Commerce's annual business confidence survey, released in December 2006, showed 100% of respondents had a "good" or "satisfactory" outlook for 2007. Survey results indicated a positive economic outlook through 2009.

On the international front, Hong Kong is a separate and active member of the WTO and the Asia Pacific Economic Cooperation (APEC) forum, where it is an articulate and effective champion of free markets and the reduction of trade barriers. Hong Kong residents across the political spectrum supported China's accession to the WTO, believing this would open new opportunities on the mainland for local firms and stabilize relations between Hong Kong's two most important trade and investment partners, the United States and China.

**FOREIGN RELATIONS**
Hong Kong's foreign relations and defense are the responsibility of China. Hong Kong is an independent customs territory and economic entity separate from the rest of China and is able to enter into international agreements on its own behalf in commercial and economic matters. Hong Kong, independently of China, participates as a full member of numerous international economic organizations including the World Trade Organization (WTO), the Asia Pacific Economic Cooperation forum (APEC), and the Financial Action Task Force (FATF).

**U.S.-HONG KONG RELATIONS**
U.S. policy toward Hong Kong, grounded in a determination to promote Hong Kong's prosperity, autonomy, and way of life, is stated in the U.S.-Hong Kong Policy Act of 1992. The United States maintains substantial economic and political interests in Hong Kong. The United States supports Hong Kong's autonomy by concluding and implementing bilateral agreements; promoting trade and investment; arranging high-level visits; broadening law enforcement cooperation; bolstering educational, academic, and cultural links; and supporting the large community of U.S. citizens and visitors.

Hong Kong is an active member of the global coalition against terrorism. Hong Kong has joined the Container Security Initiative and remains an important partner with regard to eliminating funding for terrorist networks and combating money laundering. Hong Kong has passed legislation designed to bring Hong Kong into compliance with applicable UN anti-terror resolutions and Financial Action Task Force recommendations.

The United States has substantial economic and social ties with Hong Kong. There are some 1,100 U.S. firms, including 889 regional operations (295 regional headquarters and 594 regional offices), and about 54,000 American residents in Hong Kong. According to U.S. Government statistics, U.S. exports to Hong Kong totaled $17.8 billion in 2006. U.S. direct investment in Hong Kong at the end of 2005 totaled about $37.9 billion, making the United States one of Hong Kong's largest investors, along with China, Japan, and the Netherlands.

The United States and Hong Kong signed a civil aviation agreement in October 2002, which significantly liberalized the aviation market. Hong Kong enjoys a high degree of autonomy as a separate customs territory, with no changes to borders, staffing, or technology export controls since the 1997 handover. Intellectual property rights (IPR) protection has improved substantially in recent years and the introduction of effective new legislation to control illicit production and improved enforcement has now made Hong Kong a regional model for effective IPR protection. The Office of the U.S. Trade Representative and other U.S. agencies now regularly cite Hong Kong as an example for others.

The Hong Kong Government maintains three Economic and Trade Offices in the United States. Addresses, telephone numbers, and web sites for these offices are listed below:

1520 - 18th Street NW
Washington, DC 20036

Tel: (202) 331-8947
Fax: (202) 331-8958
Web Site: http://www.hketowashington.gov.hk/dc/index.htm

115 East 54th Street
New York, NY 10022
Tel: (212) 752-3320
Fax: (212) 752-3395
Web Site: http://www.hketony.gov.hk/ny/index.htm

130 Montgomery Street
San Francisco, CA 94104
Tel: (415) 835-9300
Fax: (415) 421-0646
Web Site: http://www.hketosf.gov.hk/sf/index.htm

**Principal U.S. Officials**
Consul General--James B. Cunningham
Deputy Principal Officer--Marlene Sakaue

The U.S. Consulate General is located at 26 Garden Road, Hong Kong. Tel: (852) 2523-9011 (general). Fax: (852) 2845-1598 (general); (852) 2147-5790 (consular); (852) 2845-9800 (commercial).

**TRAVEL AND BUSINESS INFORMATION**
The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Consular Information Sheets, Public Announcements, and Travel Warnings. **Consular Information Sheets** exist for all countries and include information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Public Announcements** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at http://www.travel.state.gov, where the current Worldwide Caution, Public Announcements, and Travel Warnings can be found. Consular Affairs Publications, which contain information on obtaining passports and planning a safe trip abroad, are also available at http://www.travel.state.gov. For additional information on international travel, see http://www.usa.gov/Citizen/Topics/Travel/International.shtml.

The Department of State encourages all U.S citizens who traveling or residing abroad to register via the State Department's travel registration website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The National Passport Information Center (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4USA-PPT (1-877-487-2778). Customer service representatives and operators for TDD/TTY are available Monday-Friday, 7:00 a.m. to 12:00 midnight, Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control

and Prevention in Atlanta, Georgia. A hotline at 877-FYI-TRIP (877-394-8747) and a web site at http://www.cdc.gov/travel/index.htm give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. A booklet entitled "Health Information for International Travel" (HHS publication number CDC-95-8280) is available from the U.S. Government Printing Office, Washington, DC 20402, tel. (202) 512-1800.

**Further Electronic Information**

**Department of State Web Site**. Available on the Internet at http://www.state.gov, the Department of State web site provides timely, global access to official U.S. foreign policy information, including Background Notes and daily press briefings along with the directory of key officers of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website http://www.osac.gov

Export.gov provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

STAT-USA/Internet, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the National Trade Data Bank.