UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CHRISHA CREATIONS, LTD.

Plaintiff,

vs.

TL TOYS HK, LTD.

Defendant.

Civil Action No.: 06-0499S

**APPENDIX OF UNREPORTED DOCUMENTS CITED IN PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR A DEFAULT JUDGMENT**

Thomas C. Plunkett #1662
KIERNAN, PLUNKETT & REDIHAN
91 Friendship Street
Providence, RI 02903
(401) 831-2900 - Tel
(401) 331-7123 - Fax
e-mail: tplunkett@kprlaw.com

Stephen J. Smirti, Jr.
Celeste M. Butera
Jason B. Gurdus
RIVKIN RADLER LLP
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3000 - Tel
(516) 357-3333 - Fax

# APPENDIX OF UNREPORTED DOCUMENTS

(1) *In re American International Group, Inc.*, 2007 U.S. Dist. LEXIS 15624 (S.D.N.Y. 2007)

(2) *Questionnaire Accompanying the Provisional Version of the New Practical Handbook on Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*

(3) *Greene v. Le Dorze*, 1998 U.S. Dist. LEXIS 4093 (N.D. Tex. 1998)

(4) Section 3 of the Official Languages Ordinance (Chapter 5 of the Laws of Hong Kong)

(5) *Jeri-Jo Knitwear, Inc. v. E.S. Sutton, Inc.*, 1995 U.S. Dist. LEXIS 18035 (S.D.N.Y. 1995)

(6) *Sir Charles 2X v. District of Columbia*, 1990 U.S. Dist. LEXIS 16731 (D. Col. 1990)

(7) *Wells Fargo v. Ovalles*, 2005 U.S. Dist. LEXIS 29042 (D.R.I. 2005)

(8) *Hasbro, Inc. v. Chang*, 2006 U.S. Dist. LEXIS 35529 (D.R.I. 2006)

# APPENDIX 1

LEXSEE 2007 U.S. DIST. LEXIS 15624

**IN RE AMERICAN INTERNATIONAL GROUP, INC. SECURITIES LITIGATION; THIS ORDER RELATES TO: ALL ACTIONS; FLORIDA STATE BOARD OF ADMINISTRATION, Plaintiff, - against - AMERICAN INTERNATIONAL GROUP, INC., MAURICE GREENBERG, MARTIN J. SULLIVAN, HOWARD SMITH, MICHAEL J. CASTELLI, CHRISTIAN MILTON, L. MICHAEL MURPHY, KAREN RADKE, JEAN-BAPTIST TATEOSSIAN, and DAVID N. FIELDS, Defendants.**

**Master File No. 04 Civ. 8141 (JES), 05 Civ. 7886 (JES)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2007 U.S. Dist. LEXIS 15624***

**March 2, 2007, Decided**
**March 5, 2007, Filed**

**COUNSEL:** [*1] JIM PETRO, ATTORNEY GENERAL OF OHIO, LABATON SUCHAROW & RUDOFF LLP, Attorneys for Plaintiff Ohio State Funds and for Class, New York, NY, THOMAS A. DUBBS, ESQ., LOUIS GOTTLIEB, ESQ., MARTIS ALEX, ESQ., DONALD P. DELANEY, ESQ., Of Counsel.

HAHN LOESER & PARKS LLP, Attorney for Attorney General of Ohio, Ohio State Funds, and Class, Cleveland, OH, ALAN KOPIT, ESQ., Of Counsel.

WILLIAMS & CONNOLLY LLP, Attorneys for Defendant Michael Murphy, Washington, D.C., GERALD A. FEFFER, ESQ., CRAIG D. SINGER, ESQ., STEPHEN D. ANDREWS, ESQ., Of Counsel.

**JUDGES:** John E. Sprizzo, United States District Judge.

**OPINION BY:** John E. Sprizzo

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

**SPRIZZO, D.J.:**

Before the Court are two Motions to Dismiss filed by defendant Michael Murphy ("Murphy"). For the reasons set forth below, the Court denies both Motions.

**BACKGROUND**

The above-captioned actions are securities fraud actions n1 on behalf of persons who purchased publicly-traded securities of American International Group ("AIG"). Murphy was a senior executive at AIG's offices in Bermuda.

n1 The action captioned 04-8141 is a class action.

[*2]

Plaintiffs in the action captioned 04-8141 first attempted to serve Murphy through Bermuda's Central Authority, which never personally served Murphy, instead delivering the papers to Murphy's wife. See Def.'s Mem. of Law, dated December 19, 2005, 1-2; Pls.' Mem. of Law, dated February 6, 2006, 48-49. Plaintiffs in the action captioned 05-7886 served defendant Murphy through a private process server in January 2006. See Pls.' Mem. of Law in Opp'n to Mot. to Dismiss, dated March 17, 2006, 21. Defendant Murphy filed Motions to Dismiss in both actions under *Rule 12(b)(5) & (6)*. The Court reserved decision on these Motions pending plaintiffs' attempt to re-serve defendant. n2 See Order, dated April 27, 2006 (04-8141); Order, dated April 27, 2006 (05-7886).

n2 Therefore, the Court has previously denied the Motion as to Murphy's claims under 12(b) (6).

Ultimately, in both actions, defendant Murphy was served personally by private process servers. n3 See Def.'s Status Report Regarding His Motion to [*3] Dis-

miss (04-8141), dated November 22, 2006, 2; Pl.'s Mem. of Law (05-7886), dated March 17, 2006, 21.

n3 In the action captioned 05-7886, plaintiffs never attempted to reserve defendant Murphy, relying instead on the initial service by private process server. See Def.'s Status Report, dated November 22, 2006, 2.

**DISCUSSION**

When a defendant challenges the sufficiency of service of process under *Rule 12(b)(5)*, "the plaintiff bears the burden of proving its adequacy." See *Beatie & Osborne LLP v. Patriot Sci. Corp., 431 F. Supp. 2d 367, 384 (S.D.N.Y. 2006)* (internal quotations omitted). In considering such a motion, a Court "must look to matters outside the complaint to determine whether it has jurisdiction." See id. (internal quotations omitted).

The United States and Bermuda are both signatories to the Hague Convention. See Hague Convention, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (appended to *Fed. R. Civ. P. 4* [*4] ) ("Hague Convention"). The Hague Convention authorizes up to four alternative methods of serving process: "(1) service through the Central Authority of member states; (2) service through consular channels; (3) service by mail if the receiving state does not object; and (4) service pursuant to the internal laws of the state." See *Burda Media, Inc., v. Viertel, 417 F.3d 292, 300 (2d Cir. 2005)*; Hague Convention, Articles 5-6. 8-10.

The Hague Convention directs parties to serve process through the Central Authority of the State addressed, see Hague Convention, Article 5, but specifically states that it does not interfere with "the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials *or other competent persons* of the State of destination," see id., Article 10(c) (emphasis added).

The United Kingdom, on behalf of Bermuda, took a very limited reservation with regard to paragraphs (b) and (c) of Article 10, stating that "documents for service *through official channels* will be accepted in the United Kingdom only by the central or additional authorities and only [*5] from judicial, consular, or diplomatic officers of other Contracting States." See Declaration of the United Kingdom, Hague Convention ("Declaration") (emphasis added), Pd; *Koehler v. Dodwell, 152 F.3d 304, 307 (4th Cir. 1998)*. This narrow exception applies only to documents sent through "official channels." See *Koehler, 152 F.3d at 307*. In a footnote responding to a letter requesting interpretation of the reservation to Article 10(c), the United Kingdom further explains this reservation, confirming that the declaration does not preclude service "'directly' through a competent person other than a judicial officer or official." See Declaration fn.*.

Therefore, provided that the process servers who personally served Murphy constitute "other competent persons" under Article 10(c) of the Hague Convention, service was proper. Defendant Murphy was personally served by plaintiffs' agents in each action. Service of process in Bermuda is governed by the Rules of the Supreme Court 1985, which require personal service on the defendant by plaintiff or plaintiff's agent. See Rules of the Supreme Court, 1985, Order 10/1(1). The private process servers [*6] who personally served Murphy constitute competent persons for purposes of service under *Rule 10*.

Because this Court deems service of process on defendant Murphy valid, it need not address Murphy's alleged evasion of service. Additionally, as to defendant's claims that service was improper due to untimeliness, this Court is not inclined to consider the delay in service unreasonable in light of plaintiffs' persistent attempts to serve defendant through a variety of methods. Plaintiffs have clearly shown "good cause" for the failure to serve within 120 days under *Fed. R. Civ. P. 4(m)*.

**CONCLUSION**

Based on the foregoing, because service on defendant Murphy was proper pursuant to Bermuda law and the Hague Convention, defendant Murphy's Motions to Dismiss are hereby denied.

It is **SO ORDERED**

DATED: New York, New York

March 2, 2007

John E. Sprizzo

United States District Judge

# APPENDIX 2

Légalisation / Preuves / Notification
Legalisation / Evidence / Service

Doc. prél. No 2
Prel. Doc. No 2

Juillet /July 2003

HccH
HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW
CONFÉRENCE DE LA HAYE DE DROIT INTERNATIONAL PRIVÉ
1893|2003

**QUESTIONNAIRE ACCOMPAGNANT LA VERSION PROVISOIRE DU NOUVEAU MANUEL PRATIQUE SUR LE FONCTIONNEMENT DE LA CONVENTION DE LA HAYE DU 15 NOVEMBRE 1965 RELATIVE À LA SIGNIFICATION ET LA NOTIFICATION À L'ÉTRANGER DES ACTES JUDICIAIRES ET EXTRAJUDICIAIRES EN MATIÈRE CIVILE OU COMMERCIALE**

établi par le Bureau Permanent

* * *

**QUESTIONNAIRE ACCOMPANYING THE PROVISIONAL VERSION OF THE NEW PRACTICAL HANDBOOK ON OPERATION OF THE HAGUE CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS**

drawn up by the Permanent Bureau

*Document préliminaire No 2 de juillet 2003*
*à l'intention de la Commission spéciale d'octobre / novembre 2003*

*Preliminary Document No 2 of July 2003*
*for the attention of the Special Commission of October / November 2003*

Permanent Bureau | *Bureau Permanent*
6, Scheveningseweg 2517 KT The Hague | *La Haye* The Netherlands | *Pays-Bas*
telephone | *téléphone* +31 (0)70 363 3303 fax | *télécopieur* +31 (0)70 360 4867
e-mail | *courriel* secretariat@hcch.net website | *site internet* http://www.hcch.net

# QUESTIONNAIRE ACCOMPAGNANT LA VERSION PROVISOIRE DU NOUVEAU MANUEL PRATIQUE SUR LE FONCTIONNEMENT DE LA CONVENTION DE LA HAYE DU 15 NOVEMBRE 1965 RELATIVE À LA SIGNIFICATION ET LA NOTIFICATION À L'ÉTRANGER DES ACTES JUDICIAIRES ET EXTRAJUDICIAIRES EN MATIÈRE CIVILE OU COMMERCIALE

établi par le Bureau Permanent

* * *

# QUESTIONNAIRE ACCOMPANYING THE PROVISIONAL VERSION OF THE NEW PRACTICAL HANDBOOK ON OPERATION OF THE HAGUE CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS

drawn up by the Permanent Bureau

This *Questionnaire* accompanies a draft update of *the practical Handbook relating to operation of the Hague Convention of 1965 on the Service Abroad of Judicial or Extrajudicial Documents in Civil or Commercial Matters*.

As the latest version of the Handbook is dated 1992, it had become essential to update it in order to describe the evolutions and possible difficulties encountered in practice in this matter during the past decade. The Permanent Bureau has sought to fill this gap having regard to its current knowledge and to the information that the States have been pleased to provide to it with respect to their own experiences in the Convention's implementation. The Permanent Bureau stresses that this new version of the Handbook is merely provisional. A final version of the new Handbook will be published after the Special Commission meeting that will be held from 28 October to 4 November, 2003 and take account of the work performed and comments made there. In order to report in the best possible manner the current situation of practice and case-law, **States and Observers are invited to inform the Permanent Bureau of their comments concerning the provisional version of the Handbook and to specify any other items that they would wish to see in the final version.**

The *Questionnaire* below has been designed in order, first, to collect information of a technical nature allowing an effective updating of the Handbook, and second, to determine the strategic issues deserving consideration during the next meeting of the Special Commission.

The questions are therefore very diverse. Some relate to administrative information and updates (such as contact information for the Central Authority), others to information concerning application of the Convention in the Contracting States (such as the method for delivery of the document). The use of new communication technology in connection with the procedure for service (domestic and international) is also broached.

We emphasize the importance of your replies as regards in particular matters of a strategic nature for preparation of the Special Commission's next meeting. This is why we request that you provide them to us, if possible **before 15 September 2003,** by electronic mail at the following addresses: cb@hcch.nl and lt@hcch.nl.

## I – QUESTIONS ADDRESSED TO NON-PARTY STATES

**1** Are there any particular reasons why your State has not ratified the 1965 Convention?

**2** Do you envisage becoming a Party to the 1965 Convention? If yes, why?

## II - ADMINISTRATIVE INFORMATION AND UPDATES

The Permanent Bureau draws the States' and Observers' attention to the importance of regular updates of this information in order to secure effective implementation of the Convention.

### 3 Central Authority

3.1 The administrative information relating to the Central Authority is, and shall remain, accessible on the Conference's website. Updating this information is essential. For such purpose, could you check whether the contact information for the Central Authority or Authorities in your State as it appears on the site at http://www.hcch.net/e/status/stat14e.html is accurate, and if necessary, provide us with your corrections and supplementary information? This contact information includes the postal address, telephone number, fax number, and if possible, the Central Authority's e-mail address.

3.2 An indication of the languages used by those authorities' staff would also be very helpful.

3.3 Do you have at your disposal statistical information relating to the number and source of requests directed at your State's Central Authority? If so, could you provide it to us?

### 4 Case-law and reference works

The Permanent Bureau warmly thanks the States which have provided it with their case-law and reference works on the subject since 1992. This information considerably enriches the Permanent Bureau's knowledge of the Convention's actual operation, and has been integrated into the provisional version of the Handbook.

4.1 The Permanent Bureau invites the States and Observers to provide it with copies of significant Court rulings issued pursuant to the 1965 Convention since 1992 and not cited in the provisional version of the Handbook. Insofar as the text of the ruling is drafted in a language other than English or French, a summary in the English or French language of the facts and grounds for the ruling would be very helpful.

4.2 Likewise, the Permanent Bureau invites the Contracting States to forward to it a list of bibliographical references of works and articles published in those States since 1992 in connection with the 1965 Convention.

## 5 Handbook

5.1 In connection with redesign of the Hague Conference's website, the Permanent Bureau is considering the desirability and feasibility of providing access on its site to the information contained in the second and third parts of the former Handbook relating to forwarding Authorities, the principal and alternative transmission channels and the methods for execution of requests for service, for each State party to the Convention. The provisional version of the new Handbook provides information and useful explanations relating to the Convention's operation; more specific information by country, however, would require regular updates, which the Handbook, even if revised, cannot in practice provide adequately. It being specified that a decision in favor of the Conference's website would have implications in terms of resources, would you be in favor of such a proposal? If so, could you specify the information that you would consider useful to have appear on the site?

5.2 Does the structure (headings, sub-headings) of the Handbook's provisional version seem satisfactory to you? Do you have any suggestions?

5.3 Would you wish to see in the Handbook other items that are not contained in the provisional version? If so, which?

5.4 The Handbook seems to be a very useful tool for practitioners in applying the Convention. Regular and continuous updating would be desirable, therefore. How would you contemplate such an updating of the Handbook, both in terms of frequency and in terms of resources?

5.5 Could you provide a list of useful links to Internet sites containing information concerning application of the Convention in your State, or more generally regarding service in your State?

## III - INFORMATION RELATING TO APPLICATION OF THE CONVENTION

The Permanent Bureau urges States to answer the following questions and to inform it of any suggestion or criticism that could contribute to enhancing the Handbook's practical value and to effective preparation of the Special Commission's meeting.

## 6 Scope of the Convention (Article 1) (*cf.* I, 5 of the Handbook)

6.1 Have you noted a change since 1992 in interpretation of the Convention's scope?

6.2 More particularly, has the scope of the phrase "in civil or commercial matters" given rise to difficulties (*cf.* I, 5, D)? Have the Courts interpreted it autonomously?

6.3 Have you noticed a change since 1992 regarding the interpretation that the 1965 Convention is not mandatory in that it is up to the *lex fori* to determine whether a document should be transmitted abroad (*cf.* I, 5, B., c))?

6.4 Have you noted a change since 1992 regarding the Convention's exclusive character (*cf.* I, 5, B. c))?

6.5 Does the terminology used in the Convention (e.g. "*acte introductif d'instance*" or "writ of summons") give rise to interpretation difficulties in connection with changes in your domestic law?

## 7 Forwarding authority (*cf.* II, 1, B. (a))

7.1 Which are in your country the Authorities or persons competent to forward a request for service to the foreign Central Authority under Article 3?

7.2 Do you consider that cooperation between Central Authorities to determine the competence of the forwarding authority should remain subject to "special circumstances", or on the contrary, that it should be encouraged in broader circumstances?

## 8 Methods for service used by the Central Authority (*cf.* II, 1, E)

8.1 In the former version of the Handbook, Part III described the methods for service used in each Contracting State. It seems important to us to bring this information up to date. For this purpose, could you summarize the methods that are or may be used by the Central Authority in your country for:

- formal service of the documents within the meaning of Article 5(1)(a) (e.g., service through a huissier or official)?
- informal delivery within the meaning of Article 5(2) (e.g., use of the police service or officials)?
- a special request by the applicant, within the meaning of Article 5(1)(b) (e.g., postal service by the Central Authority)?

8.2 In connection with these descriptions, please specify the extent and scope of requirements for translation, if any (translation of the document to be served, translation of the document's summary, translation of evidence to be served, etc.) Please specify whether your State has entered into particular agreements with other Contracting States in this respect, within the meaning of Article 20(b).

8.3 Have administrative or other forms of action, such as the setting of periods to process applications or the use of outsourcing to perform the Central Authority's duties, been taken in order to expedite the service procedures? If so, which, and have they proved effective?

8.4 Please specify also whether charge are incurred for one method for service or another and if applicable, the nature of such costs (flat-rate or proportional costs), and the method for their reimbursement.

## 9 Translation requirement (Article 5(3)) (*cf.* II, 1, E, (b))

9.1 The issue arises whether a general declaration by a State that its authorities will perform formal service only if the document to be served is drafted in or translated into its official language or languages, thereby depriving in advance its Central Authorities of the discretion conferred by the Convention, is consistent with the spirit of Article 5(3). Does such a declaration make judicial assistance substantially more cumbersome in practice?

9.2 Do you consider that it might be appropriate to adopt a Recommendation that the Central Authority of the State addressed should not call for a translation if it has reasons to believe that a document drafted in a language of the requesting State is understandable to the addressee?

9.3 Could you state your suggestions regarding implementation of such a recommendation in connection with mutual assistance between authorities?

9.4 Do you believe that the requirement of full translation of the document to be served is always appropriate, and could it not be restricted to the document's summary?

9.5 Do such translations need to be legalized or to bear an *apostille*?

## 10 Timing (*cf.* II, 1, E, d))

10.1 What is the average time required for performance of requests for service?

10.2 Are there substantial differences between States addressed?

10.3 How could the procedures for mutual assistance be improved?

## 11 Alternative transmission channels (*cf.* II, 2)

11.1 <u>Consular and diplomatic channels</u> (Articles 8 and 9) (*cf.* II, 2, B.)
Are these forwarding channels frequently used in practice?

11.2 <u>Postal channels</u> (Article 10(a)) (*cf.* II, 2, C)
Have the interpretation and application of this provision given rise to difficulties?

11.3 <u>Judicial officers, officials or other competent persons</u> (Article 10(b)) (*cf.* II, 2, D)

a) States are invited to specify whether the transmission method described under Article 10(b) is used frequently.

b) If your State uses transmission between huissiers, can you specify:
   - i) with which States this procedure is used?
   - ii) how this system operates?

c) Information relating to the costs of forwarding and reimbursement of the costs would also be useful.

d) Contracting States are invited to provide to the Permanent Bureau the contact information for the national bodies governing huissiers de justice. This contact information includes the postal address, telephone number, fax number and if possible, the national organization's e-mail address.

e) Are your country's lawyers or solicitors authorized to perform service from abroad?

11.4 Interested persons (Article 10(c))
Have the interpretation and application of this provision given rise to difficulties?

**12 Judicial and extrajudicial documents (*cf.* I, 5, E)**

12.1 Does your country's legislation make a distinction between judicial documents producing procedural effects and those that do not? If so, do the authorities in your country apply the Convention to these two classes of judicial documents or only to those judicial documents producing procedural effects?

12.2 Could you provide us with the statistics at your disposal, if any, relating to the volume of extrajudicial documents forwarded abroad under the Convention?

**13 Date of service - double date (*cf.* II, 1, E, f))**

13.1 What is your view of the dual-dating system?

13.2 Does your country's domestic law provide for a system to determine, in the event of transmission abroad, the date of service for the applicant (as in Belgium, when the applicant has carried out the formalities required by Belgian law)?

**14 Exequatur**

14.1 In your country, would it be possible to deny enforcement of a foreign judgment on grounds of breach of public policy based on the service procedure applied, even though that service has been performed by the methods provided for under the Convention? If so, in what circumstances?

We are thinking, for instance, of the following situation: the addressee's (contracting) State has not objected to postal channels. The requesting State sends the service to the addressee without performing a translation (which is not required by the Convention in this particular instance). After receipt of the certificate of service, a judgment is entered. In your view, may the addressee's State refuse enforcement of the foreign judgment on the grounds that the service has not been translated?

**15 Exclusion of application of the Convention between the parties (*cf.* I, 5, B., 5))**

15.1 Have rulings been issued in your country permitting the parties to exclude application of the Convention between themselves by agreement or contract?

**16 Fax and electronic mail (*cf.* II, 3)**

16.1 Form of the request
a) Would the Central Authority of your country, as State addressed, be willing to accept requests forwarded to it by fax or e-mail? If so, subject to what requirements?
b) Are e-mail and fax used in your country, as requesting State, to forward requests for service?

16.2 Form of service

a) In your State, may service from abroad be performed by e-mail or fax? If so, subject to what requirements?

b) If your State allows postal channels for service from abroad, might the use of e-mail instead of postal channels be contemplated? If so, subject to what requirements?

c) As requesting State, does your domestic law accept service performed by e-mail or fax in the State addressed?

16.3 Form of the certificate

a) Does the Central Authority or any other competent authority in your country use or seek to use e-mail or fax for the sending of the certificate of due performance of service? If so, in what circumstances?

b) As requesting State, would you accept receipt by e-mail or fax of a certificate of service abroad? If so, in what circumstances?

16.4 Could you provide us with the statutes or case-law in your country, if any, permitting or ruling out the use of e-mail or fax in service procedures, whether domestic or international?

16.5 Is the use of e-mail or fax in service procedures subject to specific security requirements?

16.6 Is the clause for service whereby parties to a contract agree in advance to receipt of service of any document by electronic channels used in practice (*cf.* II, 3, B., 2)? Does your domestic law recognize it as being valid?

## 17 Model forms

17.1 Do you consider that the model forms ought to be revised? If so, how?

17.2 In particular, do you consider that information for the addressee, such as the amount due, the place and period for payment, the manner in which a defense may be exercised and the consequences for the defendant of failure to enter a defense, ought to be added to them?

17.3 Amendment of the Request Form, to provide for a specific box for a description and declaration of the capacity and competence of the forwarding authority, might be contemplated. Such a solution would allow ascertainment that the request has indeed been forwarded by an authority or officer competent under the requesting State's law. Would you be in favor of such a change?

17.4 As the form is technically a part of the Convention, any proposed amendment requires in principle a formal revision of the Convention, and probably the drafting of a Protocol to which a State would subsequently have to decide to become a party for the new Request Form to become effective in that State. As such a procedure seems very formalistic and fairly cumbersome, adoption of a new Form by way of Recommendation, as in 1980, might be contemplated. Does this solution indeed seem more appropriate to you?

17.5 Would an electronic version of the model forms be useful?

## 18 Reservations and reciprocity

18.1 Do Contracting States not opposing direct service <u>through postal channels</u> in accordance with Article 10 assert reciprocity against Contracting States having stated their opposition to this transmission method, or do they accept direct service through postal channels from such States?

18.2 Do Contracting States not opposing transmission through <u>consular channels</u> within the meaning of Article 8 assert reciprocity against Contracting States having stated their opposition to this transmission method?

## 19 Article 25: Bilateral and multilateral agreements (*cf.* IV)

19.1 Could you provide us with a list of the bilateral or multilateral agreements binding your country and other Contracting States with respect to international service?

19.2 For States Parties to the 1965 Convention and to the Interamerican Convention (Interamerican Convention on Letters Rogatory): how does the use in practice of such two instruments operate (*cf.* IV, 1)? More specifically, what is the relationship between them?

19.3 For States Parties to the 1965 Convention and bound by EU Regulation No 1348/2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters: how does the use of such two instruments operate in practice? Under its Article 20(1), the Regulation prevails over the Convention. How is the relationship between the two instruments managed in practice (*cf.* IV, 3)?

19.4 For States Parties to the 1965 Convention and members of the AALCO (African Asian Legal Consultative Organisation): what has been the impact of the AALCO model during bilateral negotiations conducted by your State (*cf.* IV, 2)?

# APPENDIX 3

LEXSEE 1998 U.S. DIST. LEXIS 4093

**JENNIE GREENE, Plaintiff, vs. DANIEL LE DORZE and TREVILS ET PALANS, Defendants.**

**CA 3-96-CV-590-R**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

***1998 U.S. Dist. LEXIS 4093***

**March 24, 1998, Decided**
**March 24, 1998, Filed; March 25, 1998, Entered on Docket**

**DISPOSITION:** [*1] Defendants' motion to dismiss for insufficient service of process DENIED; Defendants' motion to quash summons DENIED; and Defendants' motion for summary judgment based on statute of limitations DENIED.

**COUNSEL:** For JENNIE GREENE, plaintiff: Robert Edward Goodman, Jr., Attorney at Law, Law Office of Robert Goodman, Dallas, TX USA.

For TREVILS ET PALANS: Elizabeth de Kreuznach, Paris France.

For DANIEL LE DORZE, defendant: Gregory Paul Standerfer, Attorney at Law, Moseley & Standerfer, Hampton Court, Dallas, TX USA.

Daniel Le Dorze, defendant, Pro se, Soisy/Montmorency France.

**JUDGES:** CHIEF JUDGE JERRY BUCHMEYER, UNITED STATES DISTRICT COURT.

**OPINION BY:** JERRY BUCHMEYER

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Now before this Court is Defendants' Motion to Dismiss, or in the Alternative, Motion to Quash Summons and, Subject Thereto, Motion for Summary Judgment, filed on March 26, 1997. Defendants allege that (1) this Court has no personal jurisdiction because Plaintiff failed to properly serve Defendants; (2) the summonses are defective; and (3) Plaintiff's claims are barred by statute of limitations. For the reasons stated below, Defendants' motion is denied in its entirety.

[*2] **I. Background**

Plaintiff Jennie Greene is a resident of Pima County, Arizona. Defendant Daniel Le Dorze is a French national. Defendant Trevils et Palans is a French corporation. On March 5, 1994, Greene and Le Dorze shared an American Airlines flight from Dallas, Texas to Portland, Oregon. Greene alleges that Le Dorze stuck his leg in the aisle, causing Greene to trip and fall. Greene filed her complaint in this action on February 29, 1996, seeking actual and punitive damages based on negligence, assault and battery, and intentional infliction of emotional distress.

On March 12, 1996, Greene contacted Crowe Foreign Services ("CFS") to assist with service of process on the Defendants, who were located in France. CFS arranged for the summons and complaint to be translated into French. On June 13, 1996, Alan Crowe of CFS sent both English and French versions of the summons and complaint to the French Ministry of Justice. Greene filed a motion to extend her time to file proof of service on June 28, 1996, which was granted on July 2, 1996. Defendants were served by French authorities on August 1, 1996, and they filed an answer on August 22, 1996. Greene filed proof of service on [*3] September 16, 1996.

**II. Service of Process**

Defendants first argue that service of process was insufficient. Because service in this case was effected outside of the United States, *Rule 4(f) of the Federal Rules of Civil Procedure* governs. n1 *Fed. R. Civ. P. 4(f)*. Rule 4(f) allows for service of process "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudi-

cial Documents." *Id.* Under the Hague Convention, n2 process is sent to the Central Authority of the State in which process is to be served. n3 Hague Convention, art. 3. The Central Authority must arrange to have process served on the Defendants. *Id.* art. 5. Then the Central Authority, or an authority designated by it, must complete a certificate detailing how, where, and when service was made, or explaining why service was prevented. *Id.* art. 6. Finally, the completed certificate is sent back to the original applicant. *Id.*

n1 *Fed. R. Civ. P. 4(h)(2)*, which governs service of foreign corporations like Trevils et Palans, authorizes any method allowed by Rule 4(f), save one inapplicable exception.

[*4]

n2 Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, *opened for signature* Nov. 15, 1965, *20 U.S.T. 361,* 658 U.N.T.S. 163, *reprinted in Fed. R. Civ. P. 4* (West 1998). This treaty is more commonly referred to as simply the "Hague Convention," a nickname that is not terribly helpful in light of the countless other treaties *also* called the "Hague Convention." These include the Hague Convention Respecting the Laws and Customs of War on Land, Hague Convention on the Civil Aspects of International Child Abduction, Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters, Hague Convention for the Protection of Cultural Property in the Event of an Armed Conflict, and the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, just to name a few. With all due respect to what is surely a fine city, it seems to the Court that treaty-drafters need a new place to draft all of these conventions. Numerous alternate sites are available right here in the Northern District of Texas. The "Waxahachie Convention" has a particularly nice ring to it.

[*5]

n3 France has designated its Ministry of Justice as its Central Authority under the Hague Convention. Hague Convention, note 12.

According to Defendants, service of process failed to conform to the Hague Convention for three reasons. First, process was forwarded to the French Ministry of Justice by Mr. Crowe, rather than by a competent authority or judicial officer. Second, the certificates returned by the French authorities failed to describe the method of service. Third, the certificates were completed by local police, instead of by the Public Prosecutor. As set out below, all three arguments fail.

**A. Mr. Crowe forwarded process to French authorities**

To initiate service under the Hague Convention, judicial documents must be sent to the foreign state's Central Authority by "the authority or judicial officer competent under the law of the State in which the documents originate." *Id.* art. 3. Defendants argue that Mr. Crowe, who forwarded process to the French Ministry of Justice, was "clearly" not such a person, and that service was thus invalid. They cite no authority for that proposition. [*6]

Admittedly, few courts have considered this question. One such court dealt with whether private attorneys were authorized to forward service to the Central Authority under the Hague Convention. *Marschhauser v. Travelers Indem. Co., 145 F.R.D. 605, 608-09 (S.D. Fla. 1992).* The *Marschhauser* court reasoned that because private attorneys were authorized to serve process under *Fed. R. Civ. P. 4(c)(2),* n4 they also qualified as a "competent authority" under Article 3. *Marschhauser, 145 F.R.D. at 608-09.*

n4 The *Marschhauser* court specifically cited Rule 4(c)(2)(A), which no longer exists after Rule 4 was amended in 1993. *See Fed. R. Civ. P. 4*, note (West 1998). *Compare Fed. R. Civ. P. 4* (West 1998) *with* 28 U.S.C.A. Rule 4 (West 1992). The change is immaterial to this issue, however. Rule 4(c)(2)(A) allowed a summons and complaint to be served "by any person who is not a party and is not less than 18 years of age." 28 U.S.C.A. Rule 4(c)(2)(A) (West 1992). Its current incarnation also permits service of a summons and complaint by "any person who is not a party and who is at least 18 years of age." *Fed. R. Civ. P. 4(c)(2)* (West 1998).

[*7]

Rule 4(c)(2) authorizes more than just attorneys, however. It allows service of summons and complaint by any person who is not a party and who is at least 18 years of age. *Fed. R. Civ. P. 4(c)(2).* In light of this, the Court sees no reason to limit the reasoning of *Marschhauser* to private attorneys. A party is "competent" to forward

process for purpose of the Hague Convention if it is "competent" to serve such documents in the country where the documents originate. Because Mr. Crowe was authorized to serve process in the United States, he was competent to forward documents originating in the United States to the French Ministry of Justice. n5

n5 It could be argued that Article 3's reference to an "authority or judicial officer" implies some kind of governmental entity, or at the very least a private citizen who could be deemed an officer of the court, like an attorney. The Court declines to adopt this reading, however. Article 3 requires an "authority or judicial officer competent under the law of the State in which the documents originate." The key interpretive question is, precisely what kind of "authority" or "competence" is required? For a treaty concerned with service of process, the most relevant type of competence or authority would seem to be the ability to serve process. Under Rule 4(c)(2), any non-party over the age of 18 is such an "authority."

[*8]

**B. Certificates failed to describe method of service**

Article 6 of the Hague Convention requires that the certificate "state that the document has been served and shall include the method, the place, and the date of service and the person to whom the document was delivered." Defendants are correct that the certificates in this case did not indicate the method of service. The certificates, like the model annexed to the Hague Convention, contained three check-boxes corresponding to each possible method of service under the Hague Convention. The French authorities, however, failed to check any of them.

Defendants argue that failure to strictly comply with the requirements of the Hague Convention is automatically fatal to effective service. This is incorrect. One court has noted that although the Hague Convention "carefully articulates the procedure which a litigant must follow in order to perfect service abroad, . . . it does not prescribe the procedure for the forum Court to follow should an element of the procedure fail." *Fox v. Regie Nationale Des Usines Renault, 103 F.R.D. 453, 455 (W.D. Tenn. 1984).* Consequently, courts have held that the Hague Convention "was not intended [*9] to supercede the general and flexible scheme of Rule 4, particularly where no injustice is likely to result to the party located abroad or the interest of the effected signatory country." *Pochop v. Toyota Motor Co., 111 F.R.D. 464, 467 (S.D. Miss. 1986)* (quotations omitted). As a practical matter, where a plaintiff has attempted in good faith to comply with the Hague Convention, and where a defendant received sufficient notice despite the technical defect, it is within a court's discretion to declare service properly perfected. *Id.; Fox, 103 F.R.D. at 455.*

Defendants do not argue that they were in any way prejudiced by the minor defect in the certificates. Although the French authorities failed to check the appropriate box for method of service, the certificates undoubtedly state that process was delivered to Defendants' address on August 1, 1996. Defendants do not contest this fact, nor do they suggest that process was never received. In fact, Defendants filed an answer three weeks later.

Furthermore, the defect was not even Greene's fault. Greene's attempt to serve Defendant's under the Hague Convention was more than just a "good faith" effort. She followed the Convention [*10] to the letter. The documents filed by Mr. Crowe with the French Ministry of Justice request personal delivery to Le Dorze, both individually and as a person authorized to accept process on behalf of Trevils et Palans, in accordance with Article 5(b) of the Convention. The fact that the French authorities made a mistake--one which appears to be merely clerical--does not render service ineffective.

**C. Certificates were completed by local police**

According to France's submission to the Hague Convention, the Public Prosecutor of the Republic is authorized to complete the post-service certificate. Hague Convention, note 12. The certificates in this case, however, appear to have been signed by French police officers. Defendants argue that this violates the Hague Convention and that service is therefore invalid. Greene responds that for purposes of serving process in France under the Hague Convention, the Public Prosecutor may delegate the tasks of serving process and completing the certificate to the local police. As support, she provides a handbook published by the Hague Conference on Private International Law n6 and a circular published by the United States Department of State, [*11] both of which indicate that the Public Prosecutor may delegate these tasks.

n6 Hague Conference on Private International Law, Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters 73 (2d ed. 1992).

Defendants retort that "Greene simply cannot rely upon the objectionable testimony of a lay person to advise the court of the law." They argue that absent more persuasive authority, France's submission to the Hague Convention must be conclusive, and completion of the certificate by anyone other than the Public Prosecutor renders service invalid. This contention, however, is mistaken. n7 Under Rule 44.1, a court may consider "any relevant material source . . . whether or not . . . admissible under the Federal Rules of Evidence." n8 *Fed. R. Civ. P. 44.1*. Such sources need not be in the form of sworn expert testimony from licensed attorneys. *United States v. First Nat'l Bank, 699 F.2d 341, 343-44* [*12] *(7th Cir. 1983); A/S Kreditt-Finans v. Cia Venetico de Navegacion S.A. of Panama, 560 F. Supp. 705, 709 (E.D. Pa. 1983), aff'd Cia Venetico de Navegacion S.A. of Panama v. Presthus, 729 F.2d 1446 (3d Cir. 1984).* Nor must a litigant present primary legal materials. A party may submit "any other information concerning foreign law that is believed to further his cause, including secondary sources." 9 Wright & Miller, Federal Practice and Procedure § 2444, at 645 (1995). Furthermore, "the trial judge is free to accept these items and to give them whatever probative value he thinks they deserve." *Id.* at 645-46.

> n7 Even if it were correct, such a minor defect is immaterial where a defendant nonetheless receives proper notice. *See* Section II.B., *supra*.

> n8 The text of Rule 44.1 refers only to foreign law, not international law. However, courts and commentators have suggested that Rule 44.1 applies to international law as well. *See Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996); United States v. Jurado-Rodriguez, 907 F. Supp. 568, 574 (E.D.N.Y. 1995);* Steinhardt, The Role of International Law As a Canon of Domestic Statutory Construction, *43 Vand. L. Rev. 1103, 1197 (1990).* Thus, Rule 44.1 would apply whether the certificates' validity is cast as a question of international law, involving the meaning of the Hague Convention, or one of foreign law, involving the authority of local police under French law.

[*13]

This judge thinks the materials submitted by Greene deserve a great deal of probative value. They are issued by reputable bodies with expertise in international law. Moreover, it seems entirely reasonable that the Public Prosecutor would delegate to local police the task of serving foreign judicial documents. Surely the Public Prosecutor's other responsibilities prevent her from singlehandedly running all over her district hunting down the likes of Daniel Le Dorze. Thus the Court concludes that the certificate was properly completed by local French police.

**III. Summonses**

Defendants also move to quash the summonses that were ultimately served on them. They claim that the summonses were "fatally defective" because of certain entries made on the return of service form printed on the back of each summons. Specifically, Defendants object to the fact that, in the space for "method of service," Greene had entered "certified mail, return receipt requested." This entry, appearing on each summons, is admittedly mysterious, because the summonses were not in fact served by certified mail. It is even more mysterious in light of the fact that it is the *only* entry on the return of [*14] service form. The server's name is not indicated, nor is the date of service. The declaration, attesting that all of the information provided is true and correct, is not signed. n9

> n9 The Court stresses that completion of local return of service forms is not required for a summons to be valid. *See Fed. R. Civ. P. 4(a).* Nor is it required by the Hague Convention. The Hague Convention provides for service to be confirmed through standardized certificates. Hague Convention, art. 6. There is no requirement that domestic return of service forms also be completed. Defendants wisely refrain from arguing that failure to complete the local return of service form renders the summonses invalid.

Defendants argue that, because the Hague Convention does not permit direct service by certified mail, the summonses are "void from the outset." Although one court in this district has held that service by mail is invalid under the Hague Convention, n10 this is irrelevant to the case at hand. Greene did not serve the summonses [*15] by mail. Rather, she followed the procedure outlined by the Hague Convention. Furthermore, it is undisputed that the challenged summonses fully conform to the requirements of Rule 4(a). *See Fed. R. Civ. P. 4(a).* Thus Defendants' shaky argument rests precariously atop the following proposition--that a properly served and substantively complete summons may be rendered void by a stray entry on an uncompleted, unsigned, and *unnecessary* form, solely because that stray entry *mentions* an improper method of service. Defendants have produced no authority for that claim, and this Court will not be the first to espouse such a bizarre principle. Defendants' motion to quash is therefore denied.

n10 *Postal v. Princess Cruises, Inc., 163 F.R.D. 497, 498 (N.D. Tex. 1995).* Federal courts have split over whether the Hague Convention authorizes service by mail. *See id. at 499* (citing cases). *Compare Ackermann v. Levine, 788 F.2d 830, 838-40 (2d Cir. 1986), and Melia v. Les Grands Chais de France, 135 F.R.D. 28, 35-36 (D.R.I. 1991), with Bankston v. Toyota Motor Corp., 889 F.2d 172, 173-74 (8th Cir. 1989).*

[*16]

**IV. Statute of Limitations**

Finally, Defendants move for summary judgment on the grounds that Greene's claims are time-barred. n11 It is undisputed that the Texas two-year statute of limitations for personal injury applies. *Tex. Civ. Prac. & Rem. Code § 16.003.* It is also undisputed that Greene filed her complaint in this action within that period. According to Defendants, however, Greene's claims are time-barred because once the complaint was filed, she failed to use diligence in serving process. Defendants are wrong.

n11 *Rule 56(c) of the Federal Rules of Civil Procedure* allows summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Melton v. Teachers Ins. & Annuity Assoc. of Am., 114 F.3d 557, 559 (5th Cir. 1997).* The court must draw all reasonable inferences in favor of the non-moving party. *Melton, 114 F.3d at 559.* As long as there appears to be some evidentiary support for disputed allegations, the motion must be denied. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

[*17]

The standard governing when a suit is timely under section 16.003 is well-settled.

> "To 'bring suit' within the two-year limitations period prescribed by section 16.003, a plaintiff must not only file suit within the applicable limitations period, but must also use diligence to have the defendant served with process. When a plaintiff files a petition within the limitations period, but does not serve the defendant until after the statutory period has expired, the date of service relates back to the date of filing if the plaintiff exercised diligence in effecting service."

*Gant v. DeLeon, 786 S.W.2d 259, 260 (Tex. 1990)* (citations omitted). Because Greene filed the complaint within the two-year period, but did not serve Defendants until after the period had expired, the critical question is whether she exercised diligence.

Greene contends that her suit is not time-barred, because she filed her complaint within the two-year limitations period and then effected timely service under *Rule 4 of the Federal Rules of Civil Procedure.* That is not necessarily enough, however. In cases where, as here, jurisdiction is based on diversity of citizenship, federal courts must apply [*18] state law to determine when a state's statute of limitations is tolled. *See Walker v. Armco Steel Corp., 446 U.S. 740, 750-51, 64 L. Ed. 2d 659, 100 S. Ct. 1978 (1980).* Indeed, federal courts applying Texas statutes of limitations have assessed a plaintiff's diligence without reference to federal service requirements. *See Tisdale v. Georgia-Pacific Corp., 854 F.2d 773, 774-75 (5th Cir. 1988); Ellis v. Great Southwestern Corp., 646 F.2d 1099, 1112-13 (5th Cir. 1981).*

Under Texas law, the amount of diligence required is that which "an ordinarily prudent person would have used in the same or similar circumstances." *Tisdale, 854 F.2d at 775, quoting Beavers v. Darling, 491 S.W.2d 711, 714* (Tex. Civ. App. 1973, no writ). Whether a plaintiff has used diligence is ordinarily a question of fact, to be determined by the jury. *Tisdale, 854 F.2d at 776, citing Hitt v. Bell, 141 S.W.2d 726, 728* (Tex. Civ. App. 1940, no writ). Consequently, finding a lack of diligence as a matter of law is only appropriate "if no excuse is offered for a delay or if the lapse of time and the plaintiffs acts are such as conclusively negate diligence." *Instrument Specialties Co. v. Texas* [*19] *Employment Comm'n, 924 S.W.2d 420, 422* (Tex. App. 1996, writ denied) (quotations omitted).

Defendants in this case have not shown as a matter of law that Greene failed to exercise diligence in effecting service on the Defendants. To the contrary, the evidence presented indicates that Greene was quite diligent. By contacting CFS on March 12, 1996, Greene set the wheels in motion for service under the Hague Convention less than three weeks after filing her complaint. Although it took CFS three months to forward the required documents to the French Ministry of Justice, such a delay is not unreasonable where legal documents must be translated into another language. Finally, the fact that the French authorities took over six weeks to serve the Defendants cannot discredit Greene's level of diligence. The procedure outlined by the Hague Convention requires

that the foreign authority ultimately effect service. Defendants' motion for summary judgment based on statute of limitations is therefore denied.

**V. Conclusion**

For the reasons stated above, Defendants' motion to dismiss for insufficient service of process is DENIED; Defendants' motion to quash summons is DENIED; and Defendants' [*20] motion for summary judgment based on statute of limitations is DENIED.

It is so **ORDERED.**

**Entered:** MARCH 24, 1998.

CHIEF JUDGE JERRY BUCHMEYER

UNITED STATES DISTRICT COURT

# APPENDIX 4

雙語法例資料系統
Bilingual Laws Information System

## Individual Section Mode

Previous section of enactment | Next section of enactment | Switch language | Back to the List of Laws

## Contents of Section

| | | | | | |
|---|---|---|---|---|---|
| Chapter: | 5 | Title: | OFFICIAL LANGUAGES ORDINANCE | Gazette Number: | |
| Section: | **3** | Heading: | **Official languages and their status and use** | Version Date: | 30/06/1997 |

(1) The English and Chinese languages are declared to be the official languages of Hong Kong for the purposes of communication between the Government or any public officer and members of the public and for court proceedings. (Amended 51 of 1995 s. 2)
(2) The official languages possess equal status and, subject to the provisions of this Ordinance, enjoy equality of use for the purposes set out in subsection (1).

Previous section of enactment | Next section of enactment | Switch language | Back to the List of Laws

# APPENDIX 5

LEXSEE 1995 U.S. DIST. LEXIS 18035

**JERI-JO KNITWEAR, INC., Plaintiff, -against- E.S. SUTTON, INC. and SUTTON INVESTMENTS, LTD., Defendants.**

**94 Civ. 8551 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***1995 U.S. Dist. LEXIS 18035***

**December 1, 1995, Dated**
**December 5, 1995, FILED**

**COUNSEL:** [*1] APPEARANCES:

COOPER & DUNHAM LLP, Attorneys for Plaintiff, By: Norman H. Zivin, Esq., Wendy E. Miller, Esq., New York, New York.

AMSTER, ROTHSTEIN & EBENSTEIN, Attorneys for Defendants, By: Chester Rothstein, Esq., New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge

**OPINION BY:** DENNY CHIN

**OPINION:**

MEMORANDUM DECISION

CHIN, D.J.

Defendants E.S. Sutton, Inc. and Sutton Investments, Ltd. (collectively "Sutton") move pursuant to *Fed. R. Civ. P. 55(c)* and *60(b)* for an order vacating an entry of default. For the reasons stated below, the motion is denied.

BACKGROUND

Plaintiff Jeri-Jo Knitwear, Inc. ("Jeri-Jo") designs fabrics for use in the manufacture of clothing. Sutton is in the wholesale clothing business. In this copyright infringement case, Jeri-Jo alleges that Sutton infringed on its copyrights by selling clothing that utilized its designs without its permission or consent.

Jeri-Jo notified Sutton of the alleged infringement by letter dated December 3, 1993. During the early part of 1994, the parties engaged in a series of correspondence and telephone conversations to identify the alleged infringements and to discuss settlement. In mid-1994, communications [*2] stopped for about five months.

On November 28, 1994, Jeri-Jo served Sutton with the summons and complaint in this action. On December 27, 1994, after Sutton had failed to respond to the complaint within the time required under the Federal Rules of Civil Procedure, Jeri-Jo sent a letter to Sutton threatening to seek a default judgment. Sutton did not respond to the letter. On March 9, 1995, I signed a Judgment and Order, finding that Sutton was in default. An inquest was set for March 22, 1995 to determine the amount of damages.

On March 10, 1995, Jeri-Jo's counsel sent a letter notifying Sutton that the Court had set a date for an inquest. Counsel also stated that if Sutton wished to resolve the matter without an appearance, it would need to submit a settlement proposal immediately. During the next week, the parties had a series of settlement discussions. Sutton made its first settlement proposal on March 17, 1995; this offer was rejected on March 21, 1995. At that point, Sutton retained counsel and, according to Sutton, it first learned that Jeri-Jo had sought a default judgment. Sutton then appeared with counsel and moved to vacate the default.

In moving to vacate the default, [*3] Sutton does not deny infringement. Instead, it argues (1) that it is uncertain whether it in fact infringed upon Jeri-Jo's rights and (2) in any event, it sold an insignificant amount of the allegedly infringing clothing.

DISCUSSION

*Fed. R. Civ. P. 55(c)* provides that after entry of a default, the defaulting party may move to set aside the default for "good cause" shown. Once a default judgment is entered, a court may set aside the default only if the party shows, inter alia, inadvertence or excusable neglect. *Fed. R. Civ. P. 60(b)*. Although the order holding

Sutton in default was entitled "Judgment and Order," it technically was not a default judgment, as the last paragraph of the order provides that judgment would be entered after assessment of damages. Thus, in evaluating Sutton's motion, the "good cause" standard applies.

The three factors assessed in determining whether a default should be set aside for good cause are: 1) whether the default was willful, 2) whether a meritorious defense is presented, and 3) whether setting aside the default would prejudice the opposing party. *Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993).* Each of these three factors [*4] must be considered. *Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 243 (2d Cir. 1994).*

A review of each of these three factors shows that Sutton has failed to demonstrate good cause for setting aside its default. First, Sutton's default was willful, as it had adequate notice of the default but simply did not respond. Sutton's contention that Jeri-Jo misled it into believing it did not have to respond to the complaint is rejected. Jeri-Jo sent Sutton a letter expressly stating that "we will shortly be seeking entry of judgment by default." (Zivin Aff. Exh. 4). Sutton simply disregarded this letter. Moreover, Jeri-Jo was not obliged to notify Sutton of its application for a default judgment because Sutton never appeared in the action. See *Frost Belt Int'l Recording Enterprises, Inc. v. Cold Chillin' Records, 758 F. Supp. 131, 134 n.4 (S.D.N.Y. 1985).*

Although Sutton argues that it deserves leeway because it is a pro se litigant, in fact it is not a pro se litigant because it did not make an appearance until after it had retained counsel. In any case, Sutton may be more knowledgeable about the legal process than its motion papers suggest. According to an October [*5] 18, 1994 Dun & Bradstreet report, defendant E.S. Sutton, Inc. employs 85 people and recently has been involved in four lawsuits, one of which resulted in an unsatisfied judgment. (Zivin Aff. Exh. 5). These facts cast doubt on Sutton's claim that its ignorance of the law caused its default. See *Original Appalachian Artworks, Inc. v. Yuil Int'l Trading Corp., 105 F.R.D. 113, 116 (S.D.N.Y. 1985).*

Second, Sutton has failed to present a meritorious defense. "Although defendants are not required to show that their defenses will in fact prevail at trial, they are required to state defenses which are legally sufficient to defeat plaintiff's claim." *Id. at 117.* Here, while Jeri-Jo has made a strong showing of infringement, Sutton has not even denied that it is liable for the alleged infringement. Instead, Sutton has merely stated that it does not know whether it infringed on Jeri-Jo's copyright, and that in any event, any infringement was relatively minor. These statements fail to provide a basis for setting aside the default. See *Frost Belt, 758 F. Supp. at 136-40; Original Appalachian Artworks, 105 F.R.D. at 116.* Moreover, Sutton's contentions regarding the extent of infringement [*6] relate not to the issue of liability but to the issue of damages. Sutton may raise these arguments at an inquest on damages, but they do not support its motion to vacate the default.

Third, vacating the default judgment would prejudice Jeri-Jo. Ordinarily, "delay alone is not sufficient basis for establishing prejudice." *Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983).* Under the present circumstances, however, where Sutton lacks any defense to the action, Jeri-Jo would be prejudiced by the unnecessary delay and needless litigation. See Salomon v. 1498 Third Realty Corp., 148 F.R.D. 127, 131 (S.D.N.Y. 1993); *United States v. Forma, 784 F. Supp. 1132, 1140 (S.D.N.Y. 1992).* Thus, vacating the default judgment would prejudice Jeri-Jo.

CONCLUSION

For the reasons set forth above, Sutton's motion to vacate the default is denied. Counsel for the parties are to appear for an inquest on December 14, 1995 at 10:00 a.m. in Courtroom 11A of the Courthouse at 500 Pearl Street.

SO ORDERED.

Dated: New York, New York
December 1, 1995

DENNY CHIN

United [*7] States District Judge

# APPENDIX 6

LEXSEE 1990 U.S. DIST. LEXIS 16731

**SIR CHARLES 2X (COX), Plaintiff, v. DISTRICT OF COLUMBIA, Defendant**

**Civil Action No. 90-1691-LFO**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

***1990 U.S. Dist. LEXIS 16731***

**December 3, 1990, Decided**
**December 4, 1990, Filed**

**JUDGES:** [*1]

Louis F. Oberdorfer, United States District Judge.

**OPINION BY:**

OBERDORFER

**OPINION:**

MEMORANDUM

This matter is currently before the Court on plaintiff's motion for entry of default judgment and defendant's motion to set aside the clerk's entry of default. For the reasons stated below, in an accompanying order plaintiff's motion will be granted and defendant's motion denied.

I.

On July 9, 1990, the Court granted plaintiff Charles 2X (Cox) leave to file in forma pauperis. As is the normal practice of this Court, the complaint was reviewed to determine whether sua sponte dismissal was appropriate. See *28 U.S.C. § 1915*(d) (1988) (authorizing sua sponte dismissal of frivolous complaints filed in forma pauperis). In the complaint, plaintiff alleges that early in 1990, he was transferred from a federal prison in California to the District of Columbia Jail. He further alleges that before his personal belongings were returned to him his legal papers were intentionally removed. These allegations clearly state a claim upon which relief may be granted. The right to access to courts is fundamental. See *Bounds v. Smith, 430 U.S. 817, 828 (1977).* It is protected by several constitutional provisions. [*2] See *Wolff v. McDonnell, 418 U.S. 539, 579 (1974)* (due process clause); *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972)* (First Amendment); *Chambers v. Baltimore & O. R. Co., 207 U.S. 142, 148 (1907)* (privileges and immunities clause). Accordingly, courts considering the matter have determined that it "follows logically that the allegation of intentional violation of the right of access to the courts states a cause of action under § 1983." *Simmons v. Dickhaut, 804 F.2d 182, 183 (1st Cir. 1986)* (per curiam) (citations omitted); accord *Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986); Jackson v. Procunier, 789 F.2d 307, 310 - 11 (5th Cir. 1986); Carter v. Hutto, 781 F.2d 1028, 1031 - 32 (4th Cir. 1986);* Tyler v. "Ron" *Deputy Sheriff or Jailer/Custodian of Prisoners, 574 F.2d 427, 429 (8th Cir. 1978); Hiney v. Wilson, 520 F.2d 589, 591 (2d Cir. 1975); Sigafus v. Brown, 416 F.2d 105, 107 (7th Cir. 1969).* Accordingly, the clerk's office was instructed to issue a summons in this matter.

Defendant District of Columbia was served process on August 3, 1990. Although Federal Rule of Civil Procedure allows only twenty days [*3] in which to answer a complaint, see *Fed. R. Civ. P. 12(a)*, the District of Columbia failed to either answer or to seek an enlargement of time within that period of time. On September 10, 1990, plaintiff filed a Notice indicating that the District of Columbia had yet to respond to his complaint. On September 26, 1990, he filed an affidavit for entry of default. Pursuant to Rule 55(a) the clerk entered a default. On October 3, 1990, plaintiff moved for a default judgment.

On October 9, 1990, the District of Columbia lodged an opposition to plaintiff's motion for default and thereby put the clerk in a bit of a quandary. A "default" is merely a recognition by the clerk that a party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." *Fed. R. Civ. P. 55(a)*. This technical document cannot be opposed. Accordingly, the clerk returned the District's papers, apparently with the instruction that defendant must move instead to set aside the default under Rule 55(c). Following the clerk's in-

structions, the District of Columbia filed a "Motion of Defendant District of Columbia to Set Aside Clerk's Entry of Default." However, these instructions [*4] were apparently given without knowledge that plaintiff had filed a motion for default judgment. Defendant's arguments are clearly responsive to that motion. See Defendant's Memorandum in Support of Motion to Set Aside at 1 (indicating that "on October 9, 1990, the undersigned received plaintiff's motion for default" [hereinafter "Defendant's Memorandum"]. Accordingly, the District of Columbia's motion was properly filed on October 17, 1990 and its amended motion will be treated as an opposition to plaintiff's motion for default judgment as well as a motion to set aside default.

II.

The District of Columbia asserts that its failure to file an answer or otherwise respond in time was inadvertant, due to numerous complaints recently filed by plaintiff. In light of these burdensome complaints, the District contends that plaintiff's motion should be denied and the entry of default set aside for three reasons. First, entry of default judgments is generally disfavored by the courts. Second, plaintiff has not shown that he would be prejudiced by setting aside the default. Third, the District contends that it has a meritorious defense, set forth in a motion to dismiss filed with its [*5] opposition. Defendant also suggests that the policy behind Rule 55(e) n1 -- which according to defendant disfavors "entering a default . . . without satisfactory evidence," see Defendant's Memorandum at 4 -- applies to the District of Columbia. Defendant does not suggest any alternative sanctions for its failure to abide by this Court's deadlines.

n1 That rule provides in full:

No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

Fed. A. Civ. P. 55(e).

Plaintiff disputes the District's characterization of its late filing as "inadvertant." Although admitting to having filed five complaints, plaintiff asserts that defendant's counsel has a pattern of late filings. Moreover, plaintiff asserts that the proper response by counsel to a burdensome number of complaints was to file a motion for enlargement of time. Furthermore, defendant was on notice as of September 10 of its [*6] failure to file, yet it took no action until after an entry of default was entered and a motion for default judgment filed. According to plaintiff, these facts, combined with defendant counsel's history of late filings, demonstrates a willful disregard for this Court's rules and processes.

Defendant did not file a reply.

III.

The District of Columbia has correctly identified the general policy on default judgments in this circuit. Judgment by default is normally reserved for a "totally unresponsive party." *Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980).* In other cases, there is a strong policy against entry of judgment "as a penalty for delays in filings." *Id. at 835;* accord *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970)* (per curiam). Although determination of whether a default judgment is appropriate is committed to the discretion of the trial court, see *Jackson v. Beech, 636 F.2d at 835; Keegel v. Key West & Caribbean Trading Co., 627 F.2d 372, 373 (D.C. Cir. 1980),* "exercise of that discretion entails consideration of whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the [*7] alleged defense was meritorious." *Keegel, 627 F.2d at 373* (citations omitted); accord *Jackson v. Beech, 636 F.2d at 837 - 38.* Moreover, "an abuse of discretion need not be glaring to justify reversal." *Keegel, 627 F.2d at 373 - 74;* accord *Jackson v. Beech, 636 F.2d at 835; Livermore, 432 F.2d at 691.*

Despite this difficult standard, once the three factors of willfulness, prejudice, and the presence of a meritorious defense are weighed, it becomes clear that a default judgment should be entered against the District of Columbia.

1. Willfulness -- Generally, "courts have been reluctant to attribute to the parties, the errors of their legal representatives." *Barber v. Tuberville, 218 F.2d 34, 36 (D.C. Cir. 1954)* quoted in *Jackson v. Beech, 636 F.2d at 837.* This case presents an exception to that general rule. First, as a public body, the District of Columbia can only act through agents. Since its counsel in this case works in the Office of the Corporation Counsel and is a public employee, that counsel is an agent of the District of Columbia and defendant's counsel's knowledge should be attributed to defendant. Second, the District of Columbia has a duty [*8] to supervise its employees, including those that are lawyers. If defendant's counsel has failed to observe this Court's policies, the District is at fault for either allowing defendant's counsel to become so overburdened that he cannot comply with Court deadlines or by failing to supervise him to assure that if he can comply, he does.

Defendant's counsel contends that his failure to file in this action was due to mere inadvertence and caused primarily by the excessive number of complaints filed by plaintiff. This contention is unpersuasive. Even if defen-

dant's counsel's factual allegations are assumed to be true, see *Jackson v. Beech, 636 F.2d at 836* (requiring that the record be construed in favor of the party moving to set aside a default or default judgment), the number of complaints nevertheless does not justify failure to comply with this Court's deadlines and procedural rules. Despite their number, there is no indication that plaintiff's complaints were onerous. The complaint in this case covers less than a page, succinctly states a single claim (intentional removal of legal papers), and provides relevant background information. The complaint in another action is similar. [*9] See Cox v. District of Columbia, No. 90 - 2194. Moreover, at least in this latter complaint, the case has been assigned to a different attorney. More fundamentally, it is not plausible to argue that the number of complaints made it too burdensome to file motions for enlargement of time: Defendant could have based such a motion upon the number of complaints filed by plaintiff.

In addition to failing to justify his failure to answer the complaint on time, defendant ignores the fact that his failure to do so was not isolated. The District did not just miss the deadline: Default was entered over a month after the time to respond had expired. Moreover, the District effectively had two opportunities to respond to the complaint because plaintiff filed a notice on September 10 that defendant had not filed an answer or otherwise responded to the complaint. Nevertheless, defendant still failed to file anything for more than twenty days. Furthermore, defendant's original opposition to the motion for entry of default judgment was filed on October 19, 1990 -- two days after the fourteen day time limit for filing an opposition. See Local Rule 108(b) (allowing eleven days in which to oppose [*10] a motion); *Fed. R. Civ. P. 6(e)* (allowing three extra days if service is by mail). Defendant also failed to file a motion for leave to file late when it filed the motion in question on November 2, 1990. Defendant has failed entirely to respond to some motions in this case. See Plaintiff's Motion to Consolidate, filed October 30, 1990; Plaintiff's Motion to Compel Production of Documents, filed October 2, 1990; Plaintiff's Request for Production of Documents, filed August 15, 1990. These facts establish a pattern of late filings which support plaintiff's assertion that defendant's counsel habitually files late and ignores courts deadlines. It should be further noted that defendant has not replied to these assertions and that this Court has first hand experience of counsel's dilatory tendencies in other cases. See, e.g., Order, Kleinbart v. District of Columbia, filed September 25, 1990 (ordering defendant to show cause why sanctions should not be imposed for failure to comply with Orders of September 27, 1990 and June 1, 1990); see also Order, Kleinbart v. District of Columbia, filed November 27, 1990) (ordering defendant to show cause why sanctions should not be [*11] imposed for failure to comply with the Order of September 25, 1990).

The purpose of Rule 55 is to ensure speedy trials and ensure compliance with the rules of civil procedure. See 10 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2693, at 487 - 89 (2d ed. 1983). Defendant's counsel has delayed resolution of this case and failed to observe the rules of this Court. The persistence of the failure indicates willfulness, if not brazenness. Because defendant is a public agency and defendant's counsel a public employee, this scienter may be imputed to defendant. As a consequence, the willfulness factor weighs heavily in favor of entry of judgment.

Prejudice to the Defendant -- The District of Columbia alleges that there would be no prejudice to the plaintiff if the motion for default judgment were entered and the default set aside. Plaintiff has not offered any response. As a consequence, this factor weighs in favor of defendant.

Meritorious defense -- The District of Columbia has failed to offer a meritorious defense. Defendant's memorandum argued that plaintiff's claim of an "alleged illegal transfer" did not state a claim upon which relief may be granted. [*12] See Defendant's Memorandum in Support of Motion to Dismiss at 4. Plaintiff's claim is, however, for alleged interference with his legal papers and with his ability to pursue pending legal proceedings. This mistake cannot be attributed to plaintiff's actions. Plaintiff has filed a motion to consolidate a case involving an allegedly improper transfer. However, that motion was filed on October 30, 1990, after Defendant's motion to dismiss was first lodged, and it has never been granted. Moreover, even if the District of Columbia was misled, it had a chance to address plaintiff's interference claim but chose not to reply to his opposition. As a consequence, the District of Columbia has failed to provide a meritorious defense. On the other hand, as stated previously, plaintiff clearly sets out a valid claim for relief. See supra 2. Accordingly, this factor is at best neutral.

In conclusion, although defendant has been responsive, the balance of considerations weighs in favor of entry of judgment by default. On the one hand, it is true that there is no evidence of prejudice to the plaintiff. On the other hand, there is no indication that defendant has a meritorious defense. Furthermore, [*13] defendant has shown a pattern of willful failure to comply with deadlines and other procedural rules. This factor far outweighs the lack of prejudice to the plaintiff and warrants entry of judgment by default. Accordingly, the accompanying order will grant plaintiff's motion for default judgment and dismiss defendant's motion to set aside the default

IV.

Plaintiff claims $ 100,000 in damages. Because the basis for this claim is not clear, it is necessary under Rule 55(b)(2) to conduct an inquiry into damages. Accordingly, the accompanying order will set a briefing schedule on the issue of damages.

ORDER - December 4, 1990, Filed

Accordingly, it is this 3rd day of December, 1990, hereby

ORDERED: that defendant's motion to set aside the default should be, and is hereby, denied; and it is further

ORDERED: that plaintiff's motion for default judgment should be, and is hereby, granted; and it is further

ORDERED: that plaintiff shall on or before December 17, 1990, file an affidavit detailing evidence of the damage he allegedly suffered; and it is further

ORDERED: that defendant may respond to that affidavit on or before January 17, 1991.

# APPENDIX 7

LEXSEE 2005 U.S. DIST. LEXIS 29042

**WELLS FARGO HOME MORTGAGE, Plaintiff, v. JOHN S. OVALLES, RUTH M. OVALLES, HOUSEHOLD MORTGAGE SERVICES, UNITED STATES OF AMERICA, and STATE OF RHODE ISLAND DEPARTMENT OF ADMINISTRATION - DIVISION OF TAXATION, Defendants.**

**CA 04-280 S**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

***2005 U.S. Dist. LEXIS 29042***

**September 12, 2005, Decided**

**PRIOR HISTORY:** *Wells Fargo Home Mortg. v. Ovalles, 2004 U.S. Dist. LEXIS 22716 (D.R.I., 2004)*

**COUNSEL:** [*1] For Wells Fargo Home Mortgage, Plaintiff: Joseph G. Butler, Barron & Stadfeld, P.C., Boston, MA.

For Household Mortgage Services, Defendant: Michelle C. Davenport, Thomas J. Walsh, Harmon Law Offices, P.C., Newton Highlands, MA; Raymond C. Pelote, Harmon Law Offices, P.C., Johnston, RI.

For Internal Revenue Service, Defendant: Michael P. Iannotti, U.S. ATTORNEY OFFICE, Providence, RI.

**JUDGES:** David L. Martin, United States Magistrate Judge.

**OPINION BY:** DAVID L. MARTIN

**OPINION:**

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the court is Plaintiff's Request for Default Judgment as to the Defendants' [sic] John S. Ovalles and Ruth M. Ovalles Pursuant to *Rule 55(b)(2) of the Federal Rules of Civil Procedure* (Document ("Doc.") #21) ("Request for Default Judgment" or "Request"). The Request for Default Judgment has been referred to me for preliminary review, findings, and recommended disposition pursuant to *28 U.S.C. § 636(b)(1)(B)* and D.R.I. Local R. 32(c). A hearing was held on May 4, 2005. For the reasons stated below, I recommend that the Request for Default Judgment be granted.

[*2] **I. Facts n1 and Travel**

n1 Because default has entered against Defendants John S.Ovalles and Ruth M. Ovalles (the "Ovalles"), see Clerk's Entry of Default (Document ("Doc.") #14), the factual allegations of the Complaint are taken as true, see *Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63 (1st Cir. 2002)* ("A defaulting party is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated.") (internal quotation marks and citation omitted); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985)* ("There is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its ... claims must be considered established as a matter of law.").

This in an action for interpleader. See Amended Complaint (Doc. #1) PP 7-14. Plaintiff Wells Fargo Home Mortgage ("Plaintiff") is a lending institution [*3] with a usual place of business in Charlotte, North Carolina. See id. P 1. On or about December 7, 2003, Plaintiff, as first mortgagee, sold by foreclosure auction sale a certain parcel of real property located at 17 Springdale Avenue, North Providence, Rhode Island (the "Real Property"). See id. P 7. Defendants John S. Ovalles and Ruth M. Ovalles (the "Ovalles"), residents of Rhode Island, were the title-holders and mortgagors of the Real Property. See id. PP 2-3, 7. The foreclosure auction sale was for breach of condition pursuant to a power of sale contained in a first mortgage on the Real Property dated January 9, 1999, and recorded on January 11, 1999, in

the Records of Land Evidence of the Town of North Providence at Book 343, Page 143, as affected by an assignment of mortgage recorded in Book 358, Page 303. See id. P 8.

The sale realized $ 272,500.00, and Plaintiff retained $ 159,746.18 from the sale proceeds, representing:

> $ 141,991.69 in outstanding principal due on the note
>
> $ 5,788.59 in interest
>
> $ 335.00 in title costs
>
> $ 600.00 in attorney's fees and costs
>
> $ 8,547.50 in sheriff costs
>
> $ 60.00 in inspection fees
>
> $ 125.00 [*4] in BPO (Broker Price Opinion) fees
>
> $ 2,298.40 in publication costs
>
> $ 159,746.18 (amount retained by Plaintiff)

Amended Complaint P 8. The remaining proceeds from the sale, $ 112,753.82, see id. P 9, have been deposited with the court, see Order Granting in Part Plaintiff's Motion for Leave to Make Deposit in Court and for Award of Attorney's Fees (Doc. #9); Further Order Re Plaintiff's Motion for Leave to Make Deposit in Court (Doc. #10).

Plaintiff alleges that the Ovalles may have an interest in the surplus funds by virtue of an ownership interest, whether legal or equitable, in all or a portion of the Real Property as evidenced by a warranty deed, dated May 17, 1988, and recorded in the Records of Land Evidence of the Town of North Providence in Book 179, Page 106. See Amended Complaint PP 10-11. Additionally, Plaintiff avers that the other three Defendants in the action, Household Mortgage Services ("Household"), the United States of America (the "United States"), and the State of Rhode Island Department of Administration - Division of Taxation ("State") may each have an interest in the surplus funds. See id. PP 12-14. Household, as assignee [*5] of Providian National Bank, may have such an interest by virtue of a mortgage dated April 2, 1999, and recorded in the Records of Land Evidence of the Town of North Providence in Book 359, Page 296. See id. P 12. The United States, via the IRS, may have such an interest by virtue of a federal tax lien, dated February 13, 2003, and recorded in the Records of Land Evidence in the Town of North Providence in Book 792, Page 166. See id. P 13. Lastly, the State may have such an interest by virtue of a tax lien, dated January 8, 2002, and recorded in the Records of Land Evidence in the Town of North Providence in Book 608, Page 165. See id. P 14.

Welles Fargo commenced this action or about March 23, 2004, by filing a complaint in the Providence County Superior Court. See Request at 1. The United States removed the action to this court on or about July 9, 2004. See Docket.

By its Amended Complaint for interpleader, Plaintiff seeks 1) to have Defendants restrained from instituting any action against Plaintiff for recovery of the surplus proceeds or any part thereof; 2) to be permitted to pay into the Court the surplus proceeds; n2 3) to be discharged from all liabilities [*6] except to the party (or parties) who the court shall determine is entitled to the surplus proceeds; and 4) such other relief as the court deems just and proper. See Amended Complaint at 4.

> n2 As previously noted, Plaintiff has already been granted permission to pay the surplus funds into the court. See Order Granting in Part Plaintiff's Motion for Leave to Make Deposit in Court and for Award of Attorney's Fees (Doc. #9); Further Order Re Plaintiff's Motion for Leave to Make Deposit in Court (Doc. #10). The funds were deposited with the court on or about November 8, 2004. See Plaintiff's Request for Default Judgment as to the Defendants John S. Ovalles and Ruth M. Ovalles Pursuant to *Rule 55(b)(2) of the Federal Rules of Civil Procedure* (Doc. #21) ("Request for Default Judgment" or "Request") at 2.

The Ovalles failed to answer or otherwise defend as required by *Rule 12(a)(1) of the Federal Rules of Civil Procedure.* See [*7] Docket. On November 24, 2004, Plaintiff moved for entry of default against the Ovalles, see Plaintiff's Request for Entry of Default (Doc. #13), and the clerk entered default against them that same date, see Clerk's Entry of Default (Doc. #14).

By the instant Request for Default Judgment, Plaintiff seeks entry of default judgment against the Ovalles, "effectively waiving any rights and/or claims that the [Ovalles] may have to surplus proceeds from [the] foreclosure sale as outlined in the [Amended] Complaint ...." Request at 1. In support of the Request, Plaintiff states, inter alia, 1) that the Ovalles, by failing to file a timely answer or otherwise defend, have not claimed an interest

in the surplus proceeds; see Request at 2; 2) that the Ovalles are not infants or incompetent persons, see id.; and 3) that they are not in the military of the United States or its allies as defined in the Soldiers and Sailors Relief Act of 1940 as amended, see id. at 3.

The instant Request for Default Judgment was filed on April 18, 2005. See Request. A hearing on the Request was held on May 4, 2005. Thereafter, the court began writing this Report and Recommendation. [*8] However, the court subsequently noticed that service upon the Ovalles had been made by posting copies of the Summons and Complaint at 173 Whitmarsh Street, Providence, Rhode Island. See Plaintiff's Request for Entry of Default (Doc. #13), Attachment ("Att.") 1 (Summons addressed to Ruth M. Ovalles showing service on 4/9/04), Att. 2 (Summons addressed to John S. Ovalles showing service on 4/9/04). As there was nothing in the record which indicated that service in this manner was authorized, the court directed Plaintiff to submit by May 24, 2005, either proof that permission to serve the Ovalles by posting was granted by the Providence County Superior Court or a memorandum explaining how service by posting satisfies the requirements of either *Fed. R. Civ. P. 4* or R.I. Super. Ct. R. Civ. P. 4. See Order for Proof or for Further Briefing (Doc. #23) ("Order of 5/10/05").

On or about May 24, 2005, counsel for Plaintiff, Attorney Joseph G. Butler ("Mr. Butler"), faxed a copy of Defendants, John S. Ovalles and Ruth M. Ovalles, Affidavit of Waiver of Service to the Clerk's Office for filing. See Letter from Butler to Clerk of 5/24/05 (cover [*9] letter accompanying the affidavit). Because the affidavit was not an original document, the Clerk's Office did not accept it and returned it to Mr. Butler's office.

On June 2, 2005, Mr. Butler sent a letter to this Magistrate Judge, explaining that his office had attempted to file the copy of the affidavit in order to comply with the Order of 5/10/05 which required a response by May 24. See Letter from Butler to Martin, M.J., of 6/2/05. The original of the Affidavit was filed on June 13, 2005. See Defendants, John S. Ovalles and Ruth M. Ovalles, Affidavit of Waiver of Service (Doc. #24) ("Ovalles Aff."). Thereafter, the court took the matter under advisement.

**II. Jurisdiction**

As an initial matter, when judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to assure itself that it has jurisdiction over both the subject matter and the parties. See *Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001)*; *In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999)*; *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 772 (10th Cir. 1997)*; [*10] *Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986)*; see also *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)* ("To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decision.'") (quoting *United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 35 (1st Cir. 1999))*; *Letelier v. Republic of Chile, 488 F. Supp. 665, 668 (D.D.C. 1980)* (holding that issue of subject matter jurisdiction should be fully explored despite previous entry of default); cf. *Hugel v. McNell, 886 F.2d 1, 3 n.3 (1st Cir. 1989)* ("Where the court rendering the default judgment is shown to lack personal jurisdiction over the defendant, ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.") (quoting 6 Moore's Federal Practice para. 55.09) (second alteration in original). Accordingly, this court examines both subject matter and personal jurisdiction.

**A. Subject Matter Jurisdiction**

This action was removed from the Providence County [*11] Superior Court by the United States. See Notice of Removal (Doc. #2). The Notice of Removal states that removal is authorized by *28 U.S.C. § 1441(a)*,n3*28 U.S.C. § 1442(a)(1)*, n4 and *28 U.S.C. § 1446*. n5 See Notice of Removal at 2. I find that removal was proper pursuant to *§ 1441(a)* because the court has original jurisdiction by virtue of the federal interpleader statute, *28 U.S.C. § 1335*. See *State St. Bank & Trust Co. v. Denman Tire Corp., 240 F.3d 83, 89 n.4 (1st Cir. 2001)* (stating that *28 U.S.C. § 1335* provides jurisdiction to federal courts over interpleader actions having "two or more adverse claimants, of diverse citizenship"); see also Amended Complaint PP 1-6 (alleging that the Ovalles' usual residence is North Providence, Rhode Island, that Household's usual place of business is Brandon, Florida, that the IRS's usual place of business is Washington, D.C., and that the Rhode Island Division of Taxation's usual place of business is Providence, Rhode Island). I also find that removal was proper pursuant to *§ 1442(a)(1)* because [*12] the action was commenced against the United States. See Amended Complaint P 5. Accordingly, I find that subject matter jurisdiction exists.

n3 *28 U.S.C. § 1441(a)* provides in pertinent part:

> (a) Except as otherwise expressly provided by Act of Congress, **any civil action** brought in a State court of which the district courts of **the United States have origi-**

> **nal jurisdiction,** may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

*28 U.S.C.A. § 1441(a) (1994)*(2005 Supp.)(bold added).

n4 *28 U.S.C. § 1442(a)* provides in pertinent part:

> (a) **A civil action** or criminal prosecution **commenced in a State court against any of the following may be removed by them to the district court of the United States** for the district and division embracing the place wherein it is pending:
>
> (1) **The United States or any agency thereof** or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*28 U.S.C. § 1442(a) (1994)*(2005 Supp.)(bold added).

[*13]

n5 *28 U.S.C. § 1446* prescribes the procedure for removal. See *28 U.S.C.A. § 1446 (1994)*(2005 Supp.).

**B. Personal Jurisdiction**

The Ovalles reside in the District of Rhode Island. See Amended Complaint P 11. n6 They were served with a copy of the summons and complaint on April 9, 2004, by posting on the dwelling at 173 Whitmarsh Street, Providence, Rhode Island, on August 30, 2004. See Plaintiff's Request for Entry of Default (Doc. #13), Att. 1 (Summons addressed to Ruth M. Ovalles showing service on 4/9/04), Att. 2 (Summons addressed to John S. Ovalles showing service on 4/9/04); see also *Fed. R. Civ. P. 4(e)*. They have executed an affidavit for filing in this action which attests that they received copies of the Summons and Complaint sometime in 2004, see Ovalles Aff. P 1, that after consulting their attorney regarding these documents they did not answer or otherwise defend this action, see id. P 2, and that "in an effort to cure any technically deficient service ... [they] [*14] waive service in [this] matter so as to facilitate the resolution of the surplus proceeds," id. P 4. Based on the foregoing, I find that the court has personal jurisdiction over them.

n6 See n.1

**III. Judgment**

As previously noted, for purposes of the instant motion, the default has established the truth of Plaintiff's allegations. See n.1. The court, having both subject matter jurisdiction and personal jurisdiction over the Ovalles and the allegations of the Amended Complaint having been established, concludes that Plaintiff's Request for Default Judgment should be granted. I so recommend.

**IV. Conclusion**

For the reasons stated above, I recommend that the Request for Default Judgment be granted and that judgment enter against the Ovalles, "effectively waiving any rights and/or claims that [they] may have to surplus proceeds from a foreclosure sale as outlined in the [Amended] Complaint ...," Request at 1, and restraining them from instituting any action for the recovery [*15] of such proceeds or any part thereof, see Amended Complaint at 4.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See *Fed. R. Civ. P. 72(b)*; D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See *United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986)*; *Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980)*.

DAVID L. MARTIN
United States Magistrate Judge
September 12, 2005

# APPENDIX 8

LEXSEE 2006 U.S. DIST. LEXIS 35529

**HASBRO, INC., Plaintiff, v. DAVID CHANG, Defendant.**

**CA 03-482 T**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

***2006 U.S. Dist. LEXIS 35529***

**May 9, 2006, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *Hasbro, Inc. v. Chang, 2006 U.S. Dist. LEXIS 35550 (D.R.I., May 30, 2006)*

**PRIOR HISTORY:** *Hasbro, Inc. v. Chang, 2006 U.S. Dist. LEXIS 6576 (D.R.I., Jan. 31, 2006)*

**COUNSEL:** [*1] For Hasbro, Inc., Plaintiff, Counter Defendant: Jeffrey K. Techentin, Adler Pollock & Sheehan P.C., Providence, RI; Kim J. Landsman, Sneha M. Patel, Patterson, Belknap, Webb & Tyler, LLP, New York, NY.

For David Chang, Defendant, Counter Claimant, Pro se, Arcadia, CA.

**JUDGES:** David L. Martin, United States Magistrate Judge.

**OPINION BY:** David L. Martin

**OPINION:**

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the court is Plaintiff's Motion to Amend the Judgment to Provide for an injunction and Monetary Relief (Document ("Doc.") #52) ("Motion" or "Motion to Amend"). By the Motion, Plaintiff Hasbro, Inc. ("Plaintiff" or "Hasbro"), seeks to amend the Judgment (Doc. #51) which was entered on February 17, 2006, in two respects. First, Hasbro requests that the text of the Judgment be amended to state the following:

> David Chang is hereby permanently enjoined from manufacturing, reproducing, distributing, advertising, selling, or displaying the GHETTOPOLY game, any other products that use or display the GHETTOPOLY name or logo, and/or ghettopoly .com brand name and/or domain name, or any other product using a design or name likely to cause confusion [*2] as to source or origin with Hasbro's MONOPOLY(R) property trading game, including but not limited to the names Redneckopoly, Hiphopopoly, Hoodopoly, Thugopoly and Latinopoly.

Memorandum of Law in Support of Plaintiff's Motion to Amend the Judgment to Provide for an injunction and Monetary Relief ("Plaintiff's Mem.") at 4. Second, Hasbro requests that the text of the Judgment be further amended to state the following:

> Judgment is hereby entered in favor of Hasbro, Inc. against David Chang in the amount of four hundred thousand dollars and zero cents ($ 400,000.00).

Plaintiff's Mem. at 5.

The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to *28 U.S.C. § 636 (b) (1) (B)*. Defendant David Chang ("Chang") has not filed an objection to the Motion, and I find that no hearing is necessary. For the reasons stated herein, I recommend that the Motion to Amend be granted.

**Background**

Hasbro sued Chang in October 2003 for trademark infringement, copyright infringement, trademark dilution and tarnishment, and unfair competition based on Chang's manufacture and sale of his GHETTOPOLY

games, [*3] an offensive and racist knock-off of Hasbro's popular MONOPOLY(R) game. See Complaint for Injunctive Relief for Violation of *Sections 32* and *43* of the Lanham Act and *Section 501* of the Copyright Act (Doc. #1) ("Complaint") PP 1, 16, 20-38; see also Plaintiff's Mem. at 2. Chang counterclaimed, seeking the cancellation of all trademark registrations owned by Hasbro for the term "MONOPOLY" for board games on the ground of genericness. See Answer with Affirmative Defenses and Counterclaim (Doc. #31) ("Answer") at 7-8.

On January 31, 2006, this Magistrate Judge issued a Report and Recommendation (Doc. #48), recommending that default judgment be entered against Chang and that his counterclaims be dismissed because of his repeated failures to provide discovery. Report and Recommendation of 1/31/06 at 25. In making this recommendation, I found that Chang had engaged in a deliberate pattern of delay and disregard of court procedures, id., and that no other sanction except default judgment would be effective in addressing his egregious violation of discovery obligations, see id. at 23.

Chang did not file an objection to the Report and Recommendation of 1/31/06, and it was [*4] accepted by Chief Judge Ernest C. Torres on February 17, 2006. See Doc. #49. Judgment was entered that same date. See Judgment (Doc. #51).

**Discussion**

Hasbro's request for a permanent injunction requires little discussion. There is a factual basis for the issuance of an injunction. Hasbro has alleged that it has received numerous complaints from consumers who are offended by GHETTOPOLY and mistakenly believe that Hasbro is in some manner associated with the game. See Complaint PP 16-17, 22, 24. Hasbro has also alleged that Chang's unlawful acts have caused and are continuing to cause irreparable harm to Hasbro's business, goodwill, and reputation. See id. P 25. Because default judgment has entered, these allegations are taken as true. See *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985)* ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its seven claims must be considered established as a matter of law."). In addition, injunctive relief was specifically requested by Hasbro in its Complaint, see Complaint at 10, and it [*5] was this Magistrate Judge's intent in "recommend[ing] that default judgment be entered against Chang as to Hasbro's claims ...," Report and Recommendation of 1/31/06 at 25, that Hasbro be granted injunctive relief, see id. at 22 (rejecting as inadequate a lesser sanction which would allow Chang to "continue to sell Ghettopoly and reap the profits therefrom."). Accordingly, I recommend that Hasbro's first request to amend the Judgment so that Hasbro is awarded a permanent injunction be granted.

Hasbro's second request raises the question of whether a damages hearing is required before the Court may award damages in the requested amount of $ 400,000.00. See *KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003)* ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is ... susceptible of mathematical computation.") (quoting *Flaks v. Koegel, 504 F.2d 702, 707 (2nd Cir. 1974)*) (alteration in original). "Following the entry of default, a district court can enter a final judgment without requiring further proof of damages only in [*6] limited situations. For example, no evidentiary inquiry is necessary if the claim is for a 'sum certain.'" *Id.* (citing 10 Moore's Federal Practice P 55.22[1] (2002) ("In cases where the court has entered default judgment and the claim is for a sum certain, the court can enter the default judgment for the amount stated in the complaint.")) (footnote omitted); see also *Farm Family Mut. Ins. Co. v. Thorn Lumber Co., 202 W. Va. 69, 501 S.E.2d 786, 790 (W. Va. 1998)* (indicating that "if the damages sought by the party moving for a default judgment are for a sum certain, or an amount which can be rendered certain by calculation, no evidentiary hearing on damages is necessary").

> In the *Rule 55* context, a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default. See, e.g., *Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 44 N.Y.2d 568, 406 N.Y.S.2d 743, 378 N.E.2d 106, 109 (1978)* ("The term 'sum certain' in this context contemplates a situation in which, once liability has been established, there can be no dispute as to the amount due, as in actions on money judgments [*7] and negotiable instruments."); see also *Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1193 (Me. 1993)* ("Such situations include actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof.").

*KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d at 19-20.* Here the action is not based on a money judgment or negotiable instrument, and it does not appear

that the damages can be determined without resort to extrinsic proof.

Nevertheless, the Court of Appeals for the First Circuit has also indicated that in limited circumstances district courts may dispense with a *Fed. Rule Civ. P. 52(b)(2)* hearing, even in the face of apparently unliquidated claims. *Id. at 21* (citing *HMG Prop. Investors, Inc. v. Parque Indus. Rio. Canas, Inc., 847 F.2d 908, 919 (1st Cir. 1988)* (holding that district court, "intimately familiar with the case from years of travail," did not abuse discretion when it forwent hearing and calculated damages from "mortgage and loan agreements, certifications [*8] by the taxing authorities, and other documents of record")); see also *Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2nd Cir. 1991)* (holding that full evidentiary hearing is not required when court had been "inundated with affidavits, evidence, and oral presentations by opposing counsel"); *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc., 722 F.2d 1319, 1323 (7th Cir. 1983)* (holding that district court did not abuse discretion by failing to hold hearing when amount claimed was "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits" ). After consideration, this Magistrate Judge concludes that the following circumstances are sufficient to bring this matter within the exception to the general rule.

"Damages for copyright infringement include 'any profits of the infringer that are attributable to the infringement.'" *John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 47 (1st Cir. 2003)* (quoting *17 U.S.C. § 504(b)*). In addition, "[a]n accounting of defendant's profits may be awarded in a trademark infringement action 'subject to the principles [*9] of equity.'" *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 35 (1st Cir. 2002)* (quoting *15 U.S.C. § 1117 (a)*); see also id. (further holding that an award of profits is appropriate, in addition to an injunction, where the infringer has benefited from its infringement).

In this matter, the Court has already determined that Chang' s repeated failures to produce requested documents has made "it difficult, if not impossible, for Hasbro to determine and verify Chang's profits from Ghettopoly." Report and Recommendation of 1/31/06 at 17. Having found that Chang has significantly prejudiced Hasbro's ability to prove his profits from sales of Ghettopoly, see id. at 17, 18, it makes little sense to require that Hasbro prove this amount at a damages hearing when Chang has effectively prevented Hasbro from doing so. Indeed, there is little reason to believe that Hasbro could offer anything more at a damages hearing than it has already offered in support of the instant Motion, namely Chang's own deposition testimony as to his profits. See Declaration of Sneha Desai in Support of Plaintiff's Motion to Amend the Judgment to Provide [*10] for an Injunction and Monetary Relief (Doc. #53) ("Desai Decl."), Exhibit ("Ex.") B (excerpt from Chang's 8/5/05 deposition). Given Chang's lack of good faith, see Report and Recommendation of 1/31/06 at 21, and the willfulness of his violations, see id. at 19, this Court sees nothing unfair in using his own words to determine the minimum amount of his profits and to base an award of damages on that figure. n1

n1 While a damages hearing would provide Chang with an opportunity to challenge the $ 400,000.00 figure, allowing him to do so would be unfair to Hasbro because his failure to provide discovery prevents Hasbro from testing the validity of such a challenge.

Chang testified at his deposition that he made anywhere from $ 400,000.00 to $ 500,000.00 from sales of his Ghettopoly game. See Deposition of David Chang (Doc. #44) ("Chang Dep.") at 225. In light of his other testimony, this estimate appears to have been very conservative. Chang testified that he sold about 50,000 games, see id., and [*11] that he began selling the games in March of 2003 for $ 27.95 each, see id. at 187-88. Approximately six months later he increased the price to $ 29.95, see Chang Dep. at 188, and about two to three months thereafter he increased the price again to $ 39.95, see id. at 189. He testified that his total cost per game was about $ 10.00. See id. at 194. Even using the lowest price of $ 27.95, Change's profits would be close to $ 900,000.00 ($ 27.95 price per game - $ 10.00 cost per game = $ 17.95 profit per game x 50,000 games sold = $ 897,500.00).

Further evidence that Chang made substantial profits is reflected in the generous salaries which he paid members of his family for working in the business. For six months of work his sister received $ 100,000.00, and each of his parents received $ 60,000.00. See id. at 226-27. In fact, Chang testified that the sums paid to his sister and parents were "actually after taxes," id. at 227, apparently meaning that these were net amounts and that their gross salaries were even higher, see id.

Chang has also continued to sell GHETTOPOLY since being deposed on August 5, 2005. See Plaintiff's Mem. at 4; see also letter [*12] to Martin, M.J., from Techentin of 5/4/06 (stating that "Mr. Chang continues to sell his GHETTOPOLY games"). Thus, it is reasonable to conclude that his profits have increased since he provided the $ 400,000.00 to $ 500,000.00 estimate. All of these factors cause the Court to conclude that Hasbro' s request for an award of $ 400,000.00 is eminently reasonable.

In sum, I find that no damages hearing is necessary as Hasbro's request for an award of $ 400,000.00 in monetary damages is amply supported by Chang's own deposition testimony and, if anything, represents considerably less than Chang's actual profits. See *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc., 722 F.2d 1319, 1323 (7th Cir. 1983)*. Accordingly, I recommend that Hasbro's second request to amend the Judgment be granted.

**Conclusion**

For the reasons stated above, I recommend that the Motion to Amend be granted and that the Judgment be amended in the two respects requested by Hasbro which are set forth in the single-spaced, double-indented paragraphs on page 1. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk within ten (10) days of its receipt, [*13] See *Fed. R. Civ. P. 72(b)*; DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See *United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986)*; *Park Motor Mart, Inc, v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980)*.

DAVID L. MARTIN
United States Magistrate Judge
May 9, 2006